[L.A. No. 31676. Sept. 29, 1983.]

BONNIE HEDLUND et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
DARRYL JEFFREY WILSON, a Minor, etc., et al.,
Real Parties in Interest.

**698**

---

COUNSEL

John G. Kerr, Laurie Lessing-Barre, Turner & Sullivan and Mary A. O'Gara for Petitioner.

No appearance for Respondent.

Horton, Barbaro & Reilly and S. James Colloran for Real Parties in Interest.

OPINION

GRODIN, J.—By this petition for writ of mandate Bonnie Hedlund and Peter Ebersole, licensed psychologists, seek to compel respondent superior court to vacate an order overruling their demurrer to two counts of a complaint by real parties in interest LaNita Wilson and her minor son Darryl Jeffrey Wilson, of whom she is guardian ad litem, and to enter orders sustaining the demurrer and dismissing the action against them. They contend that LaNita's claim is barred on the face of the complaint by Code of Civil Procedure section 340, subdivision (3),[1] which establishes a one-year statute of limitations for actions for personal injury, and that Darryl's count fails to state a cause of action. We shall conclude that neither claim has merit and deny the petition.

*LaNita's Cause of Action*

The question posed by petitioners' first contention is whether the statute of limitations of section 340, or that of section 340.5[2] governs a cause of action against a psychiatrist or psychologist for injuries suffered as a result of a therapist's negligence in failing to warn a potential victim of a threat to the victim made by the therapist's patient.

---

[1]Unless otherwise indicated, all references herein to code sections are to the Code of Civil Procedure.

Section 340 provides in relevant part: "Within one year: . . . [¶] (3) An action for . . . injury to or for the death of one caused by the wrongful act or neglect of another . . . ."

[2]Section 340.5 provides in relevant part:

"In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. . . . Actions by a minor shall be commenced within three years from the date of the alleged wrongful act except that actions by a minor under the full age of six years shall be commenced within three years or prior to his eighth birthday whichever provides a longer period. . . .

"For the purposes of this section:

"(1) 'Health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider;

"(2) 'Professional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital."

■ ■ ■ ■ ■ To determine whether, as real parties in interest contend, section 340.5 governs,[3] we must decide whether a negligent failure to comply with the duty recognized in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], constitutes "professional negligence" within the meaning of section 340.5.

The original complaint in the underlying action was filed on November 12, 1980.

In her third amended complaint against petitioners styled as one for "Professional Malpractice," LaNita alleges as her cause of action that petitioners had rendered health care services to herself and to Stephen Wilson[4] in the form of psychotherapy, counseling and treatment; that prior to April 9, 1979, Stephen told petitioners of his intent to commit serious bodily injury upon her, and that from his communications to them petitioners, in the exercise of the professional skill, knowledge, and care possessed by members of their specialty, should have known that Stephen presented a serious danger of violence to her. She further alleges that petitioners owed her and other foreseeable victims a duty to diagnose Stephen's condition, to realize that he presented a serious threat of violence to her, and to recognize that the requirements of their profession required them to notify her of the danger. Allegedly this duty was breached when petitioners failed to warn her of the danger. Thereafter, on April 9, 1979, Stephen used a shotgun to inflict serious bodily injury on LaNita.

### *Applicability of Section 340.5 to LaNita's Action*

■ In *Tarasoff,* this court held that because a psychotherapist stands in a special relationship with a person whose conduct may need to be controlled—the patient—the therapist has a duty first to exercise " 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances' " in predicting whether the patient poses a serious danger to others, and second, "to exercise reasonable care to protect the foreseeable victim of that danger." (17 Cal.3d at pp. 438-439.) Among the alternative means by which the therapist may fulfill the duty to protect the victim is warning the

---

[3]Although the negligent act or omission in failing to warn occurs when the therapist has, or should have, diagnosed dangerousness and fails to warn or to take other appropriate steps to protect the identifiable victim, the injury which gives rise to the cause of action occurs only when the patient actually causes harm to a foreseeable victim. Petitioners do not contend here, and did not contend in their demurrer to plaintiffs' third amended complaint, that the action is barred by the statute of limitations if section 340.5 is applicable.

[4]The common last name is a coincidence. LaNita and Stephen were never married.

victim of the peril. ▇ LaNita's cause of action is founded upon an alleged breach of this duty to predict, or diagnose, dangerousness, and to warn of a danger posed by a therapist's patient. We must determine whether this breach constitutes professional negligence within the meaning of section 340.5.

Petitioners, claiming that a breach of the duty is "ordinary," not "professional" negligence, rely in part on language used by the court in *Tarasoff* stating that a therapist must exercise "reasonable care" to protect the victim once "under applicable professional standards" he determines or should have determined that the patient poses a danger. Inasmuch as this question was not before us in *Tarasoff*, however, that case is not dispositive. In order to define the scope of section 340.5, we look both to the language and the history of the section.

In 1975 the Legislature, as part of the Medical Injury Compensation Reform Act (Stats. 1975, Second Ex. Sess., ch. 1, § 1, p. 3949; Stats. 1975, Second Ex. Sess., ch. 2, § 1, p. 3978; hereinafter M.I.C.R.A.) adopted definitions of "health care provider" and "professional negligence." These definitions, used throughout M.I.C.R.A.,[5] were added to section 340.5 which establishes a three-year period of limitation on actions "for injury or death against a health care provider based upon such person's alleged professional negligence." Petitioners unquestionably are health care providers since they are "licensed or certified pursuant to Division 2 . . . of the Business and Professions Code . . . ." (§ 340.5, subpar. (1). See Bus. & Prof. Code, § 2900 et seq.) A failure to warn a third person is "professional negligence," however, only if this was an omission to act "in the rendering of professional services . . . provided that such services are within the scope of services for which the provider is licensed . . . ." (§ 340.5, subpar. (2).) The "practice of psychology" and "psychotherapy" for which a license is required and issued pursuant to division 2 of the Business and Professions Code are defined by that code as follows:

"[R]endering or offering to render for a fee to individuals, groups, organizations or the public any psychological service involving the application of psychological principles, methods, and procedures of understanding, predicting, and influencing behavior, such as the principles pertaining to learning, perception, motivation, emotions, and interpersonal relationships; and

---

[5]The definition of "professional negligence" was included in the following M.I.C.R.A. provisions: Business and Professions Code section 6146 (limitation on attorney contingency fees); Civil Code section 3333.1 (admissibility of evidence of recovery from collateral sources); section 3333.2 (limitation on noneconomic damages); Code of Civil Procedure sections 340.5, 364 (notice of intent to file action); section 667.7 (periodic payment of damage award); section 1295 (notice regarding arbitration provision in contract).

the methods and procedures of interviewing, counseling, psychotherapy, behavior modification, and hypnosis; and of constructing, administering, and interpreting tests of mental abilities, interests, attitudes, personality characteristics, emotions, and motivations.

"The application of such principles and methods includes, but is not restricted to: diagnosis, prevention, treatment, and amelioration of psychological problems and emotional and mental disorders of individuals and groups.

"Psychotherapy within the meaning of this chapter means the use of psychological methods in a professional relationship to assist a person or persons to acquire greater human effectiveness or to modify feelings, conditions, attitudes and behavior which are emotionally, intellectually, or socially ineffectual or maladjustive.

"As used in this chapter, 'fee' means any charge, monetary or otherwise, whether paid directly or paid on a prepaid or capitation basis by a third party, or a charge assessed by a facility, for services rendered." (Bus. & Prof. Code, § 2903.)

Petitioners do not deny that the duty to recognize "dangerousness" arises in their rendering of professional services in the practice of psychology, and thus injury to a patient proximately caused by a negligent failure to diagnose or predict such behavior constitutes "professional negligence" as defined in section 340.5. They argue, however, that the duty to warn a third person does not involve the rendering of professional services. In sum, petitioners' position is that "professional negligence" involves only acts in the course of diagnosis or treatment resulting in injury to the patient. An injury to a third person resulting from a failure to warn is "ordinary negligence" governed by section 340.

In support of their argument, petitioners rely on *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656 [150 Cal.Rptr. 384, 12 A.L.R.4th 27]. There, discussing one count of a complaint alleging injury resulting from a physician's failure to warn the plaintiff-patient of hazards related to the use of the Dalkon Shield intrauterine device that were discovered subsequent to its insertion, the court distinguished that cause of action from those for medical malpractice: "A cause of action is stated for failure to warn plaintiff. This would arise by virtue of a confidential relationship between doctor and patient. It is not a malpractice cause of action in the commonly understood sense but rather a malpractice action from the imposed continuing status of physician-patient where the danger arose from that relationship. It is also a cause of action for common negligence. The statute of limitations of section

340.5 would not apply even though the basic 'injury' resulted from a medical treatment for it is a separate duty to act which is involved." (86 Cal.App.3d at p. 672.)

We need not decide if *Tresemer* is correct in stating that section 340.5 would not apply to a failure to warn of the kind involved there. That statement is dictum since the action was commenced within one year of the date the plaintiff learned of her injury and its cause (86 Cal.App.3d at p. 665) and was barred by neither section 340.5 nor 340, subdivision (3). The case is also distinguishable in that the duty to warn was based on the defendant/physician's past professional relationship and arose long after he had treated plaintiff. Whether a failure to warn in those circumstances occurs "in the rendering of professional services" is not determinative of the question posed here where the duty arose and the omission to act occurred during the time that defendants were rendering professional services to Stephen.

Relying principally on *Tarasoff,* LaNita notes that the statutory definition of professional negligence is not limited to injury or wrongful death of a "patient." She argues that her cause of action sounds in professional negligence because the duty imposed on a therapist in that case is first to diagnose or recognize the danger posed by the patient and only then to warn. The warning aspect of this duty, she claims, is inextricably interwoven with the diagnostic function. We agree.

We held in *Tarasoff* that diagnoses and predictions about the danger of violence presented by a patient must be rendered under accepted rules of professional responsibility, and that in so doing therapists must exercise the " 'reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of [the profession].' " (17 Cal.3d at p. 438.) Diagnosis of "psychological problems and emotional and mental disorders" is a professional service for which a psychologist is licensed, and a negligent failure in this regard is therefore "professional negligence" as that term is defined in section 340.5. This diagnosis and prediction is an essential element of a cause of action for failure to warn. It is the basis upon which the duty to the third party victim is found. A negligent failure to diagnose dangerousness in a *Tarasoff* action is as much a basis for liability as is a negligent failure to warn a known victim once such diagnosis has been made. As LaNita notes, the decision to warn and the manner in which the warning is given may also involve professional judgment. Were we to accept petitioners' argument, the period of limitation would differ if, and could be established only when the jury determined whether, there had been a negligent failure to diagnose. The applicable statute of limitations may not be subject to such uncertainties. It must be determined on the nature of the cause of action itself, not on the basis of its components.

■ Under well established principles the applicable statute of limitations is determined by the nature of the right sued upon. (*Davies* v. *Krasna* (1975) 14 Cal.3d 502, 515 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]; *Day* v. *Greene* (1963) 59 Cal.2d 404, 411 [29 Cal.Rptr. 785, 380 P.2d 385, 94 A.L.R.2d 802].) ■ *Tarasoff* recognizes a right to expect that a licensed psychotherapist will realize when a patient poses a serious danger to another and, if that potential victim is identifiable, will act reasonably to protect the victim. The diagnosis and the appropriate steps necessary to protect the victim are not separate or severable, but together constitute the duty giving rise to the cause of action.

Our conclusion that the term "professional negligence" encompasses a failure to warn third persons is consistent with and furthers the legislative purpose in adopting M.I.C.R.A. Because they involve "professional negligence," actions based on failure to warn are subject to the several other restrictions on recovery that are part of M.I.C.R.A., including the limits on attorney contingent fees and recovery for noneconomic losses (Bus. & Prof. Code, § 6146; Civ. Code, § 3333.2), and reduction of damages to reflect payments received from collateral sources. (Civ. Code, § 3333.1.)[6]

The Legislature stated the purpose of M.I.C.R.A. is "to provide an adequate and reasonable remedy" for the "major health care crisis . . . attributable to skyrocketing malpractice premium costs and resulting in a potential breakdown of the health delivery system, severe hardships for the medically indigent, a denial of access for the economically marginal, and depletion of physicians such as to substantially worsen the quality of health care available to citizens of this state." (Stats. 1975, Second Ex. Sess., ch. 2, § 12.5, p. 4007.) When a health care provider's professional negligence results in harm to parties other than a patient the legislative purpose of reducing health care costs by reducing the dollar amount of judgments in actions for failure to warn would be frustrated if the M.I.C.R.A. restrictions were not applicable. It would be anomalous, too, if a third party's cause of action based on the same negligent act were treated differently than an action by the patient.

We conclude therefore that LaNita's cause of action is one for professional negligence and as such is governed by section 340.5.

### Darryl's Cause of Action

■ Darryl, incorporating the allegations of LaNita's cause of action by reference, alleges that he was born on June 5, 1976. He was seated next to

---

[6]See footnote 5, *ante*. In attempting to ascertain the legislative intent as an aid to construing these provisions we necessarily assume, but do not decide, that they are valid.

his mother when she was shot by Stephen. She threw herself over him thereby saving his life and preventing serious physical injury to him, but, as a result of the attack he has suffered serious emotional injuries and psychological trauma. Darryl alleges that because it was foreseeable that Stephen's threats, if carried out, posed a risk of harm to bystanders and particularly to those in close relationship to LaNita, petitioners' duty extended to him, and that this duty was breached when they failed to act to protect LaNita and such foreseeable individuals.

Because Darryl commenced his action before his eighth birthday, the action was filed within the period expressly allowed by section 340.5, and was not barred by section 340 since the limitation period was tolled during his minority (§ 352). The demurrer to his cause of action asserted only that, and may be sustained only if, the allegations failed to state a cause of action because petitioners owed him no duty.

Petitioners claim that because Stephen made no threat against Darryl, and they had no duty to warn him of the threat against LaNita, his complaint fails to state a cause of action in negligence. ■ Duty is primarily a question of law in which the foreseeability of risk to another is the principal consideration. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) ■ Although foreseeability is most often a question of fact for the jury, when there is no room for a reasonable difference of opinion it may be decided as a question of law. (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947].)

■ The question here is whether a therapist who negligently fails to fulfill his duty to warn an identifiable potential victim that a patient has threatened violence may be liable not only to the person against whom the threat is made, but also to persons who may be injured if the threat is carried out.[7] We need not decide here whether a duty exists as to all bystanders who might be injured, the foreseeability of such injury is not before us. The question posed by Darryl's claim is narrower because there can be no reasonable difference of opinion that the risk of harm to him was foreseeable. Foreseeability therefore exists as a matter of law. (*Bigbee* v. *Pacific Tel. & Tel. Co., supra,* 34 Cal.3d 49, 56.)

Darryl was both foreseeable and identifiable as a person who might be injured if Stephen assaulted LaNita. The conclusion that a young child in-

---

[7]Darryl does not allege that petitioners had a duty to warn or protect him. He claims instead that because it was foreseeable that if Stephen carried out his threat against LaNita a risk of harm to bystanders and those in close relationship to LaNita existed, they owed a duty which "extended" to him. That duty was breached, he claims, when petitioners failed to protect LaNita.

jured during a violent assault on his mother may state a cause of action under *Tarasoff* as a foreseeable and identifiable potential victim is compelled by *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. In *Dillon,* a mother alleged that she was present when the defendant, driving negligently, ran over and killed her young child, and that she suffered emotional trauma and physical injury as a result. ■

■ Noting that "[i]n the absence of 'overriding policy considerations . . . foreseeability of risk [is] of . . . primary importance in establishing the element of duty' [citations]" (68 Cal.2d at p. 739), we stated: "In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (68 Cal.2d at pp. 740-741.) We found in *Dillon* that all three factors were present, observing: "Surely the negligent driver who causes the death of a young child may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma." (68 Cal.2d at p. 741.)

■ ■ ■ ■ ■ It is equally foreseeable when a therapist negligently fails to warn a mother of a patient's threat of injury to her, and she is injured as a proximate result, that her young child will not be far distant and may be injured or, upon witnessing the incident, suffer emotional trauma.[8] Nor is it unreasonable to recognize the existence of a duty to persons in close relationship to the object of a patient's threat, for the therapist must consider the existence of such persons both in evaluating the seriousness of the danger posed by the patient and in determining the appropriate steps to be taken to protect the named victim.

---

[8]Darryl's allegation that he suffered emotional injuries and psychological trauma is adequate to state a cause of action. In *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813], this court abrogated the rule which required physical injury as a prerequisite to recovery for mental distress. There we concluded, in considering an action for negligent infliction of mental distress, that the distinction between physical and psychological injury clouded the issue and concluded that "the essential question is one of proof; whether the plaintiff has suffered a serious and compensable injury should not turn on this artificial and often arbitrary classification scheme." (27 Cal.3d at pp. 929-930.) For purposes of such recovery there is no basis on which to distinguish the emotional distress endured by a person who is a victim of an assault on another from the emotional distress of a mother viewing an injury to her child (*Dillon* v. *Legg, supra,* 68 Cal.2d 728) or from that suffered by the plaintiff in *Molien.*

In the analogous circumstance of a physician who treats a patient suffering from a communicable disease it is well established that the physician's breach of his duty to warn or protect others from the danger posed by the patient may result in liability to close family members and others who the practitioner knows or should anticipate will be in close proximity to the patient. (See, e.g., *Wojcik* v. *Aluminum Co. of America* (1959) 18 Misc.2d 740 [183 N.Y.S.2d 351, 357-358]; see also *Davis* v. *Rodman* (1921) 147 Ark. 385 [227 S.W. 612, 13 A.L.R. 1459]; *Hofmann* v. *Blackmon* (Fla.App. 1970) 241 So.2d 752; *Skillings* v. *Allen* (1919) 143 Minn. 323 [173 N.W. 663, 5 A.L.R. 922]; *Jones* v. *Stanko* (1928) 118 Ohio St. 147, 152 [160 N.E. 456].)

This court, too, has recognized that because a negligent misdiagnosis of a communicable disease may foreseeably cause injury to close members of the patient's family, the physician's duty extends to them. (*Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, 923.) The possibility of injury to Darryl if Stephen carried out his threat to harm LaNita was no less foreseeable than the harm to the mother in *Dillon* v. *Legg* and to the husband in *Molien.* We conclude, therefore, that in alleging his age and relationship to LaNita, and defendants' negligent failure to diagnose and/or warn LaNita of the danger posed by Stephen, Darryl has stated a cause of action.[9]

The alternative writ is discharged, and the petition for writ of mandamus is denied.

Bird, C. J., Kaus, J., and Broussard, J., concurred.

**MOSK, J.**—I dissent.

The majority opinion unfortunately perpetuates the myth that psychiatrists and psychologists inherently possess powers of clairvoyance to predict violence. There is no evidence to support this remarkable belief, and, indeed, all the credible literature in the field discounts the existence of any such mystical attribute in those who practice the mind-care professions.

The serious flaw in the majority opinion is its acceptance of the claim that a failure to diagnose "dangerousness" may be a basis for liability. In its text, the opinion employs such terms as failure to "predict" behavior, and

---

[9]We have no occasion in this proceeding, in which we examine only the propriety of the trial court's order overruling petitioners' demurrer, to consider issues related to proximate cause. (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 407-408 [131 Cal.Rptr. 69, 551 P.2d 389, 97 A.L.R.3d 324].) We note, however, that Darryl could not succeed without proof that but for petitioners' failure to warn LaNita of Stephen's threat, he would not have been injured.

flatly declares that a negligent act occurs "when the therapist has, or *should have* diagnosed dangerousness" (italics added), as if that subjective characteristic would be revealed through a stethoscope or by an X-ray.

In *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352], we discussed at considerable length the virtually unanimous authorities in the field of psychiatry who concede their inability to predict violence. "In the light of recent studies it is no longer heresy to question the reliability of psychiatric predictions. Psychiatrists themselves would be the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession. It must be conceded that psychiatrists still experience considerable difficulty in confidently and accurately *diagnosing* mental illness. Yet those difficulties are multiplied manyfold when psychiatrists venture from diagnosis to prognosis and undertake to predict the consequences of such illness: ' "A diagnosis of mental illness tells us nothing about whether the person so diagnosed is or is not dangerous. Some mental patients are dangerous, some are not. Perhaps the psychiatrist is an expert at deciding whether a person is mentally ill, but is he an expert at predicting which of the persons so diagnosed are dangerous? Sane people, too, are dangerous, and it may legitimately be inquired whether there is anything in the education, training or experience of psychiatrists which renders them particularly adept at predicting dangerous behavior. Predictions of dangerous behavior, no matter who makes them, are incredibly inaccurate, and there is a growing consensus that psychiatrists are not uniquely qualified to predict dangerous behavior and are, in fact, less accurate in their predictions than other professionals." ' (*Murel* v. *Baltimore City Criminal Court* (1972) . . . 407 U.S. 364-365, fn. 2 [32 L.Ed.2d 791, 797, 92 S.Ct. 2091] (Douglas, J., dis. from dismissal of cert.).)

"During the past several years further empirical studies have transformed the earlier trend of opinion into an impressive unanimity: 'The evidence, as well as the consensus of opinion by responsible scientific authorities, is now unequivocal.' (Diamond, *The Psychiatric Prediction of Dangerousness* (1975) 123 U.Pa.L.Rev. 439, 451.) In the words of spokesmen for the psychiatric profession itself, 'Unfortunately, this is the state of the art. Neither psychiatrists nor anyone else have reliably demonstrated an ability to predict future violence or "dangerousness." Neither has any special psychiatric "expertise" in this area been established.' (Task Force Report, Clinical Aspects of the Violent Individual (American Psychiatric Assn., 1974) p. 28.) And the same studies which proved the inaccuracy of psychiatric predictions have demonstrated beyond dispute the no less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not in fact take place ('false positives'), thus branding as

'dangerous' many persons who are in reality totally harmless." (*Id.*, pp. 325-327, fns. omitted.)

Because of the inherent undependability of such predictions, we adopted in *Burnick* the beyond-a-reasonable-doubt standard for commitment to mental facilities.

Unfortunately a year later in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], a thin majority of this court employed a loose and ill-conceived dictum that encourages a dilution of *Burnick*. Although the case involved *actual* knowledge of planned violence, the four-to-three majority spoke expansively in terms of what the doctor "knew or should have known." My separate opinion pointed out that there are no professional standards for forecasting violence (*id.* at p. 451), and concluded that any rule should "eliminate all reference to conformity to standards of the profession in predicting violence. If a psychiatrist does in fact predict violence, then a duty to warn arises. The majority's expansion of that rule will take us from the world of reality into the wonderland of clairvoyance." (*Id.* at p. 452.)

The dictum in *Tarasoff* has been largely ignored by the profession and by potential plaintiffs, for few cases have arisen that followed its elastic provisions. (Cf. *Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594, 599 [162 Cal.Rptr. 724].) It has been almost universally recognized that the state of the art has not reached a pinnacle at which forecasts of future violence can be made with unerring accuracy.[1] Thus no standard of predictability has developed against which professional conduct can be mea-

---

[1]This perceptive analysis was made by a distinguished journalist (Peter Schrag, *Predicting Dangerousness*, Sacramento Bee, Apr. 13, 1983):

"The hazards of the California [*Tarasoff*] standard are obvious. Among other things, it encourages breach of a necessarily confidential relationship and places subtle pressure on every practitioner to resolve doubts in favor of a prediction of dangerousness and the appropriate measures that follow; efforts to lock up the patient, to warn others of the danger that the patient may—but in reality probably doesn't—represent, and to generally play it safe, even at the risk of effective therapy.

"Should the psychiatrist warn the patient—give a kind of Miranda warning—that anything he says may be used against him? If, indeed, he does give such warning (or if the patient is informed enough to make the warning unnecessary), what kind of effective therapy, what sort of trust, remains possible? Confounding the problem even further are the contrary injunctions, both in law and ethics, against divulging professional confidences. At what point does a physician become liable for issuing warnings about his patients too casually?

"There is probably no alternative to something like the standard Mosk proposed in his [separate *Tarasoff*] opinion. Where a psychiatrist, or anyone else for that matter, is genuinely convinced that a person is dangerous and particularly that he intends harm to a specific individual—failure to warn simply can't be justified. Yet even with this narrow standard, it wouldn't take an excessively paranoid individual to be extremely cautious about consulting a psychiatrist in the first place or, if he does, about the way he discusses his thoughts and feelings."

sured. (See the representative sample of literature on the subject cited in *Burnick, supra,* 14 Cal.3d at p. 328, fn. 18; see also *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 768 [175 Cal.Rptr. 738, 631 P.2d 446].)

The regrettable aspect of the majority opinion is that its expansive view of the duty of defendants is probably unnecessary to the result. For in each of her successive complaints, the original and three amended complaints, plaintiff LaNita Wilson alleged that the defendant psychologists had been told that Stephen Wilson intended to commit serious bodily injury on her. Thus it can be argued that defendants had *actual knowledge* and therefore should have communicated a warning to the potential victim. There is no reason to muse, as the majority do, about the result that would follow if defendants merely *should have known* of the threatened violence.

The question then arises as to whether the failure to warn after actual knowledge is malpractice or simple negligence. Since it is not the medical care or treatment of a patient that is involved, but a species of civilian duty that has arisen to a third party, the acts or omissions of the doctors are not malpractice, but simple negligence. I agree with *Tresemer* v. *Barke* (1978) 86 Cal.App.3d 656, 672 [150 Cal.Rptr. 384, 12 A.L.R.4th 27], that the applicable statute of limitations is one year. Of course, inability to discover the facts or concealment of the facts—which might occur due to physician-patient confidentiality—may under appropriate circumstances toll the statute. That is not this case.

Therefore the petitioning defendants are entitled to have their demurrer sustained. As the Court of Appeal below held in a unanimous opinion, a peremptory writ of mandate to that end should issue.

Richardson, J., and Reynoso, J., concurred.

Petitioners' application for a rehearing was denied December 15, 1983. Mosk, J., was of the opinion that the application should be granted.·