[No. B166525. Second Dist., Div. Eight. July 27, 2004.]

CAL EWING, et al., Plaintiffs and Appellants, v.
NORTHRIDGE HOSPITAL MEDICAL CENTER—ROSCOE
BOULEVARD CAMPUS, Defendant and Respondent.

**COUNSEL**

Stark, Rasak & Clarke and Edmund W. Clarke, Jr., for Plaintiffs and Appellants.

Fonda & Fraser, Sandra F. Winter and Kristen J. Heim for Defendant and Respondent.

**OPINION**

**BOLAND, J.—**

### SUMMARY

As a general rule, a mental health practitioner has no duty to warn third persons about, nor any duty to predict, a patient's dangerous propensities. This rule is subject to an important exception: when a patient has "communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim," the psychotherapist must take reasonable steps to warn the victim and a law enforcement agency of the threat. (Civ. Code, § 43.92, subds. (a), (b) (section 43.92).)

In this action, the parents of a victim killed by a mental patient sued for wrongful death the mental health facility in which the patient was briefly hospitalized. The parents allege a psychotherapist employed by the hospital was aware the patient had threatened to kill their son, but failed to take steps to warn him and a law enforcement agency of the risk of harm posed by the threat.

The trial court granted the hospital's motion for nonsuit after the parents' opening statement. It found: (1) expert evidence is required to establish the exception to immunity codified at section 43.92, and the parents failed to designate an expert, and (2) because the threat of risk posed by the patient was communicated to the psychotherapist by the patient's father, not by the patient himself, the parents could not prevail. Both rulings were in error.

First, the pivotal inquiry under section 43.92 is whether the psychotherapist actually believed or predicted that the patient posed a serious risk of inflicting grave bodily injury upon a readily identifiable victim or victims. Fact finders require no expert guidance to ascertain a psychotherapist's actual belief or prediction. The mind-set of a psychotherapist can be determined by resort to common knowledge without the aid of expert testimony. Accordingly, the parents' failure to designate an expert was not fatal to their claim.

Second, when the communication of a serious threat of grave physical harm is conveyed to the psychotherapist by a member of the patient's family, and is shared for the purpose of facilitating the patient's evaluation or treatment, it is irrelevant that the family member himself is not a patient of the psychotherapist. If a psychotherapist actually believes or predicts a patient poses a serious risk of inflicting grave bodily injury upon another, it is not material that the belief or prediction was premised, in some measure, on information derived from a member of the patient's family.

## FACTUAL AND PROCEDURAL BACKGROUND

On this appeal from the grant of a motion for nonsuit "we shall, in accordance with the settled rule in cases of nonsuit, disregard conflicts and consider the evidence most favorable to plaintiff." (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 85 [147 P.2d 604] (*Lawless*).)

Plaintiffs Cal and Janet Ewing (Ewings) are the parents and heirs of Keith Ewing (Keith). Keith, who was 34 years old at the time, was shot and killed on June 23, 2001,[1] as he washed his car in the driveway of his home. The

---

[1] Unless noted otherwise, all date references are to calendar year 2001.

murderer, Geno Colello, then turned the gun on himself and committed suicide. Colello had been involved in a romantic relationship with Diana Williams for about 17 years. That relationship had recently broken up, and Williams had begun dating Keith. Colello, a Los Angeles Police Department (LAPD) officer, had been in therapy for emotional problems for years. He attributed his emotional instability to job-related injuries and, more recently, to his increasing depression and despondency over his breakup with Williams—with whom he wanted to reunite—and her new romantic relationship.

On June 21, Colello had dinner at his parents' home. He told his father he "hurt inside, and [didn't] want to live anymore." He asked his father to give him a gun so he could shoot himself. When his father refused, Colello said the alternative was that he would get a gun and go "kill [the] kid" with whom Williams was romantically involved, "and then . . . kill [himself]." The father told his son to "buckle up" and not "take the coward's way out." Colello punched his father in the face. He then asked his father to take him to the hospital, saying he "need[ed] help."

The father took Colello to respondent Northridge Hospital Medical Center—Roscoe Boulevard Campus (erroneously sued as Northridge Hospital Medical Center, and referred to hereafter as hospital). Colello and his father met with Art Capilla, a licensed clinical social worker employed by the hospital. Capilla perceived Colello as angry, upset and hostile. For his own safety, Capilla requested assistance from the hospital's security guards during the intake interview. The father told Capilla that, for the first time in his life, Colello had punched him, and had threatened to "kill the young man that Diana Williams was now seeing." He told Capilla he believed his son was likely to carry out his threat. Capilla denies having been told about the threat, either by Colello or his father, but acknowledges he was told Colello struck his father in the face. Capilla asked Colello if "he intended to kill . . . the new boyfriend." The record does not reflect Colello's response.

Capilla believed Colello met the criteria under Welfare and Institutions Code section 5150 for involuntary hospitalization. That statute permits certain professionals to temporarily and involuntarily commit a person whom the professional believes presents a danger to himself, herself or others, or is gravely disabled. However, because an involuntary hospitalization would have had negative repercussions on Colello's career as an LAPD officer, Capilla persuaded Colello to voluntarily admit himself to the hospital. If Colello had not agreed to do so, Capilla was prepared to have him involuntarily admitted under the "danger to self" criterion. Capilla also knew that, if a patient "communicated . . . a serious threat of physical violence against a reasonably identifiable victim or victims," he was legally required to make

reasonable efforts to warn the potential victim and a law enforcement agency of the threat. (§ 43.92, subds. (a), (b).) Neither Capilla, nor any other hospital representative, made any such warning about Colello.[2]

Colello was voluntarily admitted to the hospital the evening of June 21.[3] He was discharged June 22. On June 23, Colello murdered Keith Ewing and then committed suicide.

The Ewings filed this action in February 2002. The operative first amended complaint alleges a single cause of action against the hospital and Colello's treating physicians for wrongful death based on professional negligence. The Ewings alleged Colello posed a foreseeable danger to their son, and directly or indirectly through third persons communicated to the hospital, namely, Capilla, and his doctors, his intention to kill or cause grave bodily injury to Keith. They alleged the hospital and Colello's doctors failed to discharge their duty to warn their son and a law enforcement agency of the risk of harm Colello posed to Keith's safety.

Before trial, the hospital informed the trial court it intended to move for nonsuit following the Ewings' opening statement on two bases. First, the hospital argued expert testimony was required to establish a psychotherapist's liability for failure to warn under section 43.92, and the Ewings had not designated an expert witness. Second, it contended the Ewings could not satisfy the statutory exception to immunity under section 43.92, because they offered no evidence that a threat of harm was directly communicated by Colello (the patient) to Capilla (the psychotherapist),[4] and a direct communication is necessary to trigger liability under the statute. The court agreed to hear an opening statement before a jury was impaneled. The Ewings and the hospital each submitted briefs on the issues raised by the hospital's forthcoming motion.

After the Ewings presented their opening statement, the hospital's motion for nonsuit was argued and granted. The Ewings appealed.

## DISCUSSION

Two issues are presented in this appeal. First, is a psychotherapist's statutory duty to warn triggered only if the communication of a serious threat

---

[2] Although neither Capilla nor Colello's father knew Keith's name at the time, it is undisputed Keith was "readily identifiable."

[3] Colello was admitted under the care of Dr. Gary Levinson, a staff psychiatrist. Levinson was a defendant in this action, but is not involved in this appeal. Colello's parents, Victor and Anita Colello, are also defendants in this action but are not involved in this appeal.

[4] As a licensed clinical social worker, Capilla is considered a "psychotherapist." (Evid. Code, § 1010, subd. (c); § 43.92, subd. (a).)

of physical violence comes directly from the patient? Second, is expert testimony required to establish liability for a psychotherapist's failure to warn under section 43.92? The answer to each question is no.

## 1. *Standard of review.*

█ A defendant is entitled to nonsuit after the plaintiff's opening statement only if the trial court determines that, as a matter of law, the evidence to be presented is insufficient to permit a jury to find in the plaintiff's favor. (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 117–118 [184 Cal.Rptr. 891, 649 P.2d 224]; *Galanek v. Wismar* (1999) 68 Cal.App.4th 1417, 1424 [81 Cal.Rptr.2d 236].) When determining whether the plaintiff's evidence is sufficient, the court must accept as true all favorable facts asserted in the plaintiff's opening statement, indulge all legitimate inferences from those facts, and disregard all conflicting evidence. (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 930 [80 Cal.Rptr.2d 811, 968 P.2d 522].) We independently review the ruling on a motion for nonsuit, guided by the same rules that govern the trial court. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541–1542 [50 Cal.Rptr.2d 395].) We will not sustain the judgment " ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' [Citations.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

## 2. *Communication of the threat of physical violence need not come directly from the patient to the psychotherapist.*

█ The hospital contends, and the trial court agreed, that a psychotherapist's statutory duty to warn is triggered only if the communication of a serious threat of physical violence comes directly from the psychotherapist's patient. The hospital insists it cannot be liable for failure to warn under section 43.92, because the alleged threat of physical violence by Colello was conveyed to Capilla not by Colello himself, but by his father when he brought Colello to the hospital. We rejected an equivalent contention in a previously published opinion in a related appeal in this action, in which the Ewings sued Colello's long-term psychotherapist. (See *Ewing v. Goldstein* (2004) 120 Cal.App.4th 807 [15 Cal.Rptr.3d 864] (*Ewing I*).) For the reasons articulated in *Ewing I*, we do so again. When the communication of a serious threat of grave bodily injury is conveyed to the psychotherapist by a member of the patient's immediate family, and is shared for the purpose of facilitating and furthering the patient's treatment, the fact that the family member is not a patient of the

psychotherapist is not material. If a therapist actually believes or predicts a patient poses a risk of inflicting serious physical harm upon a reasonably identifiable person, the therapist must take steps to warn the potential victim and a law enforcement agency. The pivotal factual question is whether the psychotherapist actually held the belief or made the prediction. If so, it does not matter that the belief or prediction was premised, in some measure, on information derived from a member of the patient's family.

Accordingly, the trial court erred in refusing, as a matter of law, to consider information relayed by Colello's father to Capilla in determining whether the Ewings' opening statement presented sufficient evidence to survive the hospital's motion for nonsuit.

3. *The trial court's grant of nonsuit was improper because a plaintiff need not present expert evidence to establish a psychotherapist's liability for failure to warn under Civil Code section 43.92.*

The question is whether the presentation of expert testimony is a necessary prerequisite to establishing a psychotherapist's liability for failure to warn a third person of a patient's violent propensities under section 43.92. For reasons discussed below, we conclude it is not.

a. *A psychotherapist could be found liable at common law for failing to predict a patient's dangerous behavior if other mental health practitioners, adhering to standards of the profession, would have predicted such behavior.*

Our discussion begins with the expansive holding in the Supreme Court's landmark decision, *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334] (*Tarasoff*), in which a psycho-therapist's legal duty to warn was first articulated.

Before *Tarasoff*, the generally accepted rule in California had long been that, under common law, a person had no duty to control another person's conduct, nor any duty to warn others potentially endangered by that conduct. (*Richards v. Stanley* (1954) 43 Cal.2d 60, 65 [271 P.2d 23]; Rest.2d Torts §§ 315, 314, com. c, p. 116.) As with most rules, exceptions existed. An exception was carved out by the judiciary "in cases in which the defendant stands in some special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim of that conduct." (*Tarasoff, supra*, 17 Cal.3d at p. 435, citing Rest.2d Torts, §§ 315–320.) In *Tarasoff*, the Supreme Court recognized and broadly defined the exception as it relates to the special relationship between psychotherapists, their potentially dangerous patients, and their patients' intended victims.

In *Tarasoff*, a patient confided to his psychotherapist his intent to kill an unnamed but readily identifiable girl upon her return from Brazil. The therapist notified police and requested the patient's involuntary commitment for observation in a mental hospital. The police released the patient after they were satisfied that he appeared rational and promised to stay away from the girl. Despite his appearance and promise, the patient killed the girl. Her parents sued the therapist for wrongful death for failure to warn them or their daughter about the danger his patient presented. (*Tarasoff, supra,* 17 Cal.3d at pp. 432–433.) The Supreme Court narrowly rejected the therapist's contention that he owed no duty to the girl because she was not his patient. The majority held "once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." (*Id.* at pp. 431, 439.)

Justice Mosk agreed a viable claim for violation of the duty to warn was stated in *Tarasoff*, because the therapist had in fact predicted his patient's violence. (*Tarasoff*, 17 Cal.3d at p. 451 (conc. & dis. opn. of Mosk, J.).) However, in a sharply critical dissent, he took issue with "the majority's rule that a therapist may be held liable for failing to predict his patient's tendency to violence if other practitioners, pursuant to the 'standards of the profession,' would have done so." (*Ibid.*) Justice Mosk pointed to the arguments of multiple amici curiae and an "impressive body of literature" which, in his view, demonstrated amply that "psychiatric predictions of violence are inherently unreliable." (*Ibid.*) " 'It must be conceded that psychiatrists still experience considerable difficulty in confidently and accurately *diagnosing* mental illness. Yet those difficulties are multiplied manyfold when psychiatrists venture from diagnosis to prognosis and undertake to predict the consequences of such illness . . . . " 'Predictions of dangerous behavior, no matter who makes them, are incredibly inaccurate, and there is a growing consensus that psychiatrists are not uniquely qualified to predict dangerous behavior and are, in fact, less accurate in their predictions than other professionals.' " (*Murel v. Baltimore City Criminal Court* (1972) . . . 407 U.S. 355, 364–365, fn. 2 [32 L.Ed.2d 791, 92 S.Ct. 2091] (Douglas, J., dissenting from dismissal of certiorari.).)' " (*Tarasoff*, 17 Cal.3d at pp. 451–452 (conc. & dis. opn of Mosk, J.), quoting *People v. Burnick* (1975) 14 Cal.3d 306, 325–326 [121 Cal.Rptr. 488, 535 P.2d 352], italics in original.) Justice Mosk argued the majority's rule should be restructured "to eliminate all reference to conformity to standards of the profession in predicting violence. If a psychiatrist does in fact predict violence, then a duty to warn arises." (*Tarasoff* at p. 452.) By expanding the rule to create a duty to warn not just where a psychotherapist actually predicted a patient's violence, but also where other practitioners *adhering to the standard of the mental health profession would have done so,*

Justice Mosk feared the Court had taken mental health professionals "from the world of reality into the wonderland of clairvoyance." (*Ibid.*)

The issue of a psychotherapist's liability for failure to warn arose again several years later in *Hedlund v. Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41]. In *Hedlund,* the young child of a woman shot by a therapist's patient sued for emotional injuries suffered after the therapist failed to warn of a known threat against his mother. The child, who witnessed the shooting, asserted the therapist owed him a duty on the theory it was foreseeable he would be injured if the patient carried out his threats against the child's mother. (*Id.* at p. 705.) Four justices of the Supreme Court agreed. The majority held that a therapist's duty to diagnose dangerousness and warn potential victims of a patient's threatened violence extends not just to the intended victim, but also "to persons in close relationship to the object of a patient's threat . . . ." (*Id.* at p. 706.) Three justices, however, disagreed. The dissenting opinion, authored by Justice Mosk, took issue with the majority's "unfortunate[] perpetuat[ion of] the myth that psychiatrists and psychologists inherently possess powers of clairvoyance to predict violence." (*Id.* at p. 707 (dis. opn. of Mosk, J.).) Once again, although the case at hand involved allegations the therapist was *actually aware* the patient intended to assault the child's mother, the majority went much further and found, as in *Tarasoff*, that a therapist could also be liable if, according to the "standards of the profession," he *should have known* of the threatened violence. (*Id.* at pp. 707–710 (dis. opn. of Mosk, J.).) Pointing again to the professional literature, Justice Mosk noted "[i]t has been almost universally recognized that the state of the art has not reached a pinnacle at which forecasts of future violence can be made with unerring accuracy. Thus no standard of predictability has developed against which professional conduct can be measured." (*Id.* at pp. 709–710, fn. omitted.)

As presaged by Justice Mosk, *Tarasoff* and its progeny generated significant confusion and consternation among mental health professionals in two significant respects. First, a therapist's liability was now premised upon the ability to predict potential dangerousness in patients according to the "standards of the profession." Second, the duty to report impacted the very nature of the confidential relationship between therapist and patient.[5]

---

[5] In a separate dissent in *Tarasoff,* Justice Clark pointed out the potentially devastating effects of that decision on the dynamics of the patient-therapist relationship. Legal and medical experts had long "agreed that confidentiality is essential to effectively treat the mentally ill, and that imposing a duty on doctors to disclose patient threats to potential victims would greatly impair treatment." (*Tarasoff,* 17 Cal.3d at pp. 452, 458 (dis. opn. of Clark, J.).) The therapist's assurance of confidentiality is important for three reasons. First, without a guarantee of confidentiality, people afraid of the societal stigma of mental illness will be deterred from seeking help. (*Id.* at pp. 458–459.) Second, once treatment begins, complete candidness is necessary for effective psychological counseling. Without an assurance of confidentiality, the

Predicting a patient's dangerous propensities according to the standards of the profession presents four serious problems. First, it is almost universally agreed among mental health professionals themselves that therapists are poor predictors of future violent behavior. (See Rosenhan, et al., *Warning Third Parties: The Ripple Effects of Tarasoff* (1993) 24 Pac. L.J., 1165, 1185–1186, and authorities cited at fn. 134.) Second, fear of liability may cause therapists to err on the side of overpredicting dangerousness, eliciting unnecessary warnings or even causing them to avoid treating potentially dangerous patients altogether. (*Id.* at p. 1187, and fns. 141–150.) Third, imposing upon a therapist a duty to report may cause the therapist single-mindedly to focus on a patient's "dangerousness," at the expense of treating his other mental health needs. (*Id.* at p. 1188, and fns. 151–152.) Fourth, the rule holds psychotherapists to an ill-defined community standard. *Tarasoff* imposes on the therapist the duty to protect a potential victim if the therapist decides, or should have decided, the patient is potentially dangerous. "Determining whether the therapist should have diagnosed the patient as dangerous is problematic because the standard depends upon agreement in the mental health community. If psychotherapists as a group can only weakly and imprecisely predict future dangerousness, then there can be no criteria against which to judge the therapists' actions. . . . [¶] . . . [V]iolent behavior is a relatively rare event, and rare events are by their nature difficult to predict." (*Id.* at p. 1189, and fns. 153–156.)

    b.   *Section 43.92 was enacted to limit psychotherapist liability for failure to warn to instances in which the therapist actually believed or predicted a patient posed a serious risk of inflicting grave bodily injury.*

Assembly Bill No. 1133 (1985–1986 Reg. Sess.) was introduced in response to the concerns expressed in the *Tarasoff* and *Hedlund* dissents. The resulting statutory provision, section 43.92, was expressly not intended to overrule *Tarasoff* and its progeny, "but rather to limit the psychotherapists' liability for failure to warn to those circumstances where the patient has communicated an 'actual threat of violence against an identified victim[,]' " and to " 'abolish the expansive rulings of *Tarasoff* and *Hedlund* . . . that a therapist can be held liable for the mere failure to predict and warn of potential violence by his patient.' " (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1133

---

patient's conscious or unconscious inhibitions might deter the patient from expressing his innermost thoughts. (*Id.* at p. 459.) Third, even if a patient is not deterred from full disclosure, the potential revelation of confidential information to outside parties will hinder the patient's ability fully to trust the therapist, and trust is a fundamental component of effective psychotherapy. (*Id.* at pp. 459–460.) Mental health professionals found these ramifications from *Tarasoff* as deleterious as their newly expanded liability. (See Rosenhan, et al., *Warning Third Parties: The Ripple Effects of Tarasoff* (1993) 24 Pac. L.J. 1165, pp. 1189–1192, and authorities cited at fns. 166–174.)

(1985–1986 Reg. Sess.) May 14, 1985, p. 2.) In a press release issued upon the bill's introduction, its author pronounced that the bill's " 'principal effect will be to abolish the expansive rulings of *Tarasoff* and *Hedlund* to the effect that a therapist can be held liable for the mere failure to predict and warn of potential violence by his patient. Such extremely broad and open-ended liability is premised upon a degree of confidence in the predictive ability of psychologists and psychiatrists that is simply unjustified in light of our best scientific and common sense knowledge.' " (Assembly member Alister McAlister, 18th Dist., Press release on Assem. Bill No. 1133 (March 5, 1985) p. 6.)

In its codified form, section 43.92 provides:

"(a) There shall be no monetary liability on the part of, and no cause of action shall arise against, any . . . psychotherapist . . . in failing to warn of and protect from a patient's threatened violent behavior or failing to predict and warn of and protect from a patient's violent behavior except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims.

"(b) If there is a duty to warn and protect under the limited circumstances specified above, the duty shall be discharged by the psychotherapist making reasonable efforts to communicate the threat to the victim or victims and to a law enforcement agency."

In enacting section 43.92, the Legislature clearly took to heart Justice Mosk's admonition and severely narrowed the rule in *Tarasoff* to eliminate "all reference to conformity to standards of the profession in predicting violence." (*Tarasoff*, 17 Cal.3d at p. 452 (conc. & dis. opn. of Mosk, J.).) Today, a psychotherapist may be held liable for failing to warn a third party of a threat of harm only if the plaintiff is able to persuade the trier of fact the psychotherapist actually believed or predicted the patient posed a serious risk of inflicting grave bodily injury upon a reasonably identifiable victim or victims. (§ 43.92. subds. (a), (b).)

    c.   *Jurors require no expert guidance to ascertain a psychotherapist's actual belief or prediction.*

A psychotherapist may be held liable for failure to warn under section 43.92 only if the jury is persuaded the therapist actually believed or predicted his or her patient posed a serious risk of inflicting grave bodily injury upon an identifiable victim. Applied here, this rule means simply that, because there is no need for expert guidance on the "standard of care" for psycho-therapists' statutory duty to warn, the court erred when it found, as a matter

of law, that plaintiffs could not establish their claim without presenting expert testimony. If resort to expertise is unnecessary, so is the expert. (*Lawless, supra,* 24 Cal.2d at p. 86; *Zavala v. Board of Trustees of the Leland Stanford, Jr. University* (1993) 16 Cal.App.4th 1755, 1764 [20 Cal.Rptr.2d 768].) Under section 43.92, liability is not premised on a breach of the standard of care.[6] Instead, it rests entirely on the fact finder's determination that each factual predicate is satisfied: the existence of a psychotherapist-patient relationship; the psychotherapist's actual belief or prediction that the patient poses a serious risk of inflicting grave bodily injury; a reasonably identifiable victim; and the failure to undertake reasonable efforts to warn the victim and a law enforcement agency. (See BAJI No. 6.00.2 (July 2004 ed.); CACI No. 503 (July 2004 ed.).)

The hospital insists expert evidence is necessary because the Ewings chose to bring and have consistently prosecuted this case as one for professional, not simple, negligence. The hospital is mistaken.

■ As a rule, expert testimony is required to establish a health care practitioner's failure to exercise the requisite degree of learning, care or skill so as to satisfy the necessary standard of care. (*Lawless, supra,* 24 Cal.2d at p. 86.) However, in the rare circumstance in which "negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge, expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact." (*Ibid.*; *Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 141 [181 Cal.Rptr. 732, 642 P.2d 792] (*Franz*).) In cases where a layperson " 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised[,]' " no expert testimony is required. ( *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001 [35 Cal.Rptr.2d 685, 884 P.2d 142] (*Flowers*), fn. & citation omitted; *Franz, supra,* 31 Cal.3d at p. 141; see also Evid. Code, § 801, subd. (a) [permitting expert opinion testimony only where the subject is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"].)

The "common knowledge" exception is typically employed in medical malpractice cases in which the misfeasance is sufficiently obvious as to fall within the common knowledge of laypersons. Examples include cases in

---

[6] We are aware the trial court found a need for expertise as to the "seriousness" of the threat, not just the standard of care. This was incorrect. However, "a serious threat of physical violence," is defined (See *Ewing I, supra,* 120 Cal.App.4th at p. 820]), it is not beyond the layperson's ken to understand that a patient's threat to take another's life, if believed, is "serious."

which a foreign object is left in a patient's body following surgery (*Flowers, supra,* 8 Cal.4th at p. 1001), an injury occurs to a body part not slated for medical treatment (*Ybarra v. Spangard* (1944) 25 Cal.2d 486, 487–490 [154 P.2d 687] [shoulder injury during appendectomy]), or the amputation of a wrong limb. Similarly, expertise may not be necessary in medical negligence cases where the issue is whether the medical professional failed to obtain informed consent. (See *Cobbs v. Grant* (1972) 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1]; *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1190–1192 [23 Cal.Rptr.2d 131, 858 P.2d 598].) In short, the common knowledge exception applies in cases in which no scientific enlightenment is necessary because the topic is familiar to a layperson.[7]

By enacting section 43.92, the Legislature intended to limit a psychotherapist's liability for failure to warn to instances in which the therapist actually believed or predicted that the patient posed a serious threat of inflicting grave bodily injury. The mind-set of a therapist can be evaluated by resort to common knowledge without the aid of expert testimony. The Ewings are

---

[7] Other situations exist in which medical malpractice claims require no expert testimony. For example, physicians have a statutory duty to report suspected cases of child abuse, and may be civilly liable for failure to do so. (*Storch v. Silverman* (1986) 186 Cal.App.3d 671, 677 [231 Cal.Rptr. 27].) To prove a violation for failure to report, a plaintiff must persuade the factfinder the doctor actually observed injuries and formed an opinion they were intentionally inflicted on the child. Expertise, while permissible, is not necessary. The requisite state of mind of the physician may be evidenced by circumstantial evidence and inferences drawn by the jury, based on common experience. (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410–411, fn. 8, 415, fn 13 [131 Cal.Rptr. 69, 551 P.2d 389].)

The applicability of the common knowledge exception to a context similar to ours is well-illustrated by *Kerker by Kerker v. Hurwitz* (1990) 558 N.Y.S.2d 388 [163 A.D.2d 859]. A patient under a psychiatrist's care was known to have suicidal tendencies and had twice tried to kill himself, once by hanging himself from sprinkler pipes in his room. The patient made a third attempt, hanging himself on the same pipes. Although his life was saved, the patient was permanently disabled. He sued the psychiatrist for medical malpractice and common law negligence, but the trial court refused to instruct the jury on ordinary negligence. The appellate court reversed. " 'The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of the facts.' [Citations.] [¶] Although expert testimony is ordinarily required to establish a prima facie case of medical malpractice, where, as here, the issue of negligence is readily determinable by a trier of fact evaluating the evidence based on common knowledge, there is no need for expert testimony [citation]." (*Id.* at p. 390.) The gravamen of the patient's negligence claim was the psychiatrist's breach of his duty to protect, not his negligence in furnishing psychiatric care or treatment. (*Ibid.*) "It is well-established that when a risk of harm has been identified through the exercise of medical judgment, a failure to take measures to prevent the harm may constitute actionable ordinary negligence [citations]." (*Ibid.*) The reasoning of *Kerker* is equally applicable here: "[I]n cases where there is clear notice of the risk of harm, liability may be imposed without reference to professional standards of care [citations]." (*Ibid.*)

correct: "The factual predicates necessary to establish liability of a psychotherapist are outlined in Civil Code section 43.92 . . . . Liability is not based on a breach of the standard of care but rather the specific duty to warn which arises from communication of a threat." The view that adherence to a professional standard of practice is not an element of a claim for negligent failure to warn is also supported and illustrated by the jury instructions for the claim. (See e.g., CACI No. 503; BAJI No. 6.00.2.)[8] Under the unique circumstances involved in a case such as this, whether the duty to warn arises is a question of fact, not law. (See BAJI No. 6.00.2 ["If *you* [the jury] find a psychotherapist had this duty [to warn], it is satisfied and there is no liability if . . . ." (italics added)].)[9]

> d. *Hospital's motion for nonsuit was improperly granted.*

Viewing the facts most favorably to the Ewings, we conclude the record contains sufficient facts from which the jury could infer Capilla actually believed or predicted Colello would fulfill his threat to kill Keith Ewing.

Colello was an LAPD officer, well trained in the use of guns, and with ready access to them. He had been in therapy for mental and emotional problems for years, and had recently become increasingly depressed and despondent upon learning his longtime love had become romantically involved with another man. On June 21, he struck his father for the first time in his life and insisted his father get him to a mental hospital in order to obtain "help." During the intake interview with the licensed clinical social worker, Colello's father—himself a former LAPD officer—described the disturbing events of that evening, and told the social worker about Colello's threat to kill himself and "the young man [] Williams was now seeing." The father told Capilla Colello was fully capable of carrying out his threat and, indeed, was likely to do so. Capilla perceived Colello as angry, upset and hostile.

The evidence strongly indicates that Capilla believed Colello's father's statements. First, Capilla concedes Colello presented a very real threat of

---

[8] For example, CACI 503 states that, to establish a negligence claim against a psychotherapist for failure to warn, the plaintiff must prove that: (1) the defendant was a psychotherapist; (2) a third party was the psychotherapist's patient; (3) the third party communicated a serious threat of violence to the defendant; (4) the defendant knew or should have known the identity of the patient's intended victim; and (5) the defendant failed to make reasonable efforts to warn the victim and a law enforcement agency about the threat.

[9] We can conceive of circumstances involving an alleged breach of a psychotherapist's duty to warn in which expert guidance may be useful. However, we are not presented with and express no view on the issue of whether expert testimony is permissible in such a case. Our conclusion is limited: we hold only that the trial court erred in concluding that, to prevail at trial in their wrongful death action against the hospital, the Ewings were *required* to present expert evidence.

suicide, and Capilla intended to involuntarily commit Colello to the hospital if he would not agree to a voluntary admission. More importantly, it may be inferred that Capilla also believed Colello presented a very real threat of violent assault to others, including Keith. Capilla perceived Colello as angry, upset and hostile. For that reason, he specifically asked Colello whether "he intended to hurt or kill [Williams'] new boyfriend." Finally, Capilla was sufficiently concerned for his own personal safety that he insisted upon the presence of the hospital's security staff during the interview. From this evidence, a jury could reasonably infer Capilla actually believed or predicted Colello intended to carry out his threat. If so, Capilla's failure to take reasonable steps to warn and protect Keith is actionable.

## DISPOSITION

The judgment is reversed. The Ewings are awarded their costs of appeal.

Cooper, P. J., and Rubin, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 10, 2004. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.