Filed 11/15/24; Certified for Partial Pub. 12/11/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JASWINDER KAUR et al., Plaintiffs and Appellants, v. DUAL ARCH INTERNATIONAL, INC., et al., Defendants and Respondents. | F086272 (Super. Ct. No. 20CV-03476) **OPINION** |

APPEAL from an order of the Superior Court of Merced County.  Brian McCabe, Judge.

HBG Law and Harry B. Gill for Plaintiffs and Appellants.

Fores Macko Johnston & Chartrand, Cory B. Chartrand and Megan D. Johnson for Defendant and Respondent, Dual Arch International, Inc.

-ooOoo-

This matter stems from a foreclosure sale that was successfully challenged and set aside by appellants Jaswinder Kaur (Kaur) and Parkash Pabla (Pabla) (collectively "Appellants"). On the first day of trial, the trial court granted a renewed motion for nonsuit as to all remaining claims alleged against respondent Dual Arch International, Inc. ("DAII"). Appellants raise a single issue in this appeal: Did the trial court err by granting DAII's renewed motion for nonsuit? We reverse.

## FACTUAL BACKGROUND

In January 2009, Pabla's now deceased husband Dalip Pabla (Dalip) purchased property located on Burgundy Drive in Livingston, California ("the Property") as his sole and separate property.

In December 2009, Dalip executed a grant deed in which he and Pabla became joint tenants in the Property.

Apparently, on August 2, 2013, a promissory note for $60,000 was created ("the Note").[1] The borrowers on the Note are identified as Dalip and Pabla, and the lenders are identified as Gurjit Pabla, Gursharan Pabla, and Tajender Pabla, who are the stepgrandchildren of Pabla (collectively "the Stepgrandchildren"). The security for the Note is the Property. The Note indicates that it will be repaid in full on March 25, 2018, and is signed by both Dalip and Pabla on August 2, 2013.

Also, apparently created on August 2, 2013, was a short form deed of trust ("Short Form").[2] The Short Form identified the "borrower" as Dalip and Pabla, the "lender" as the Stepgrandchildren, the "trustee" as Everhome Mortgage, the "property" as the

---

[1] The date the Note was created is unclear. The Note itself indicates it was created on March 25, 2013. However, a signature by the notary is dated August 2, 2013. We will assume that the Note was fraudulently signed on August 2, 2013.

[2] Like the Note, the date the Short Form was created is unclear. The body of the Short Form states that it is dated March 25, 2013, but the notary's signature states that the Borrowers and Lenders appeared before him to sign on August 2, 2013. We again assume that the Short Form was fraudulently signed on August 2, 2013.

Property, and the "loan" as $60,000 secured by a promissory note. The Short Form indicates that it was signed by Dalip and Pabla, and a notary signed the acknowledgement on August 2, 2013. The Short Form gave the power of sale to the trustee in the event that the borrower failed to perform and pay as required by the Note. The Short Form incorporated by reference a number of provisions from of a document identified as the "Fictitious Deed of Trust." The Short Form specifically defined the fictitious deed as "that certain Fictitious Deed of Trust recorded in the in the Office of the Recorder on January 21, 2009, in Book/Volume 38, beginning at Page 47, for land situate in the county of Merced."

In October 2014, Dalip executed a grant deed transferring the Property to Pabla as her separate property.

On June 17, 2016, Gurjit Pabla recorded the Short Form with the Merced County Clerk.

On July 17, 2019, Dalip died.

On June 26, 2020, the Stepgrandchildren signed a substitution of trustee that named DAII as the new trustee.[3] The same day, DAII prepared and signed a notice of default and election to sell and sent a Fair Debt Collection Practices Act notification to Appellants.

On July 10, 2020, Appellants' counsel sent a letter to the Stepgrandchildren care of DAII that denied Appellants had any knowledge of a debt owed to or a deed of trust in favor of the Stepgrandchildren. Appellants denied any liability that could give rise to a default and demanded that verification of the liability be made, and all foreclosure activity be stopped.

---

[3] The record indicates that Lahmber Pabla, who is the son of Dalip and the father of one of the Stepgrandchildren (Tajender Pabla), made a number of communications to DAII on behalf of the Stepgrandchildren. For purposes of this motion, we include Lahmber Pabla under the collective term "Stepgrandchildren."

On July 31, 2020, the Stepgrandchildren filed with the Merced County Recorder a substitution of trustee (in which DAII was formally substituted in place of Everhome Mortgage), and a notice of default and election to sell, both of which had been previously signed on June 26, 2020.

On September 4, 2020, DAII communicated with WFG National Title Insurance Co. (WFG). DAII discussed a "vesting issue." DAII asked about whether there was a title issue on the Short Form, whether there will be a cloud on the title, and whether the owners of record signed the Short Form. WFG in part responded in effect that if there was only one signature executed on the Short Form, DAII would be "looking at percentages," but since there were two signatures, there would be no cloud on the title. WFG subsequently issued title insurance to DAII.

On November 9, 2020, DAII recorded a notice of trustee's sale. The notice stated that the sale was pursuant to the Short Form signed by Pabla and Dalip and that the sale would be held on December 9, 2020, at 12:30 p.m.

On December 8, 2020, Appellants filed a complaint against the Stepgrandchildren and DAII in an attempt to stop foreclosure and quiet title. The complaint alleged that the Short Form and Note were forgeries and thus, void.[4]

On December 9, 2020, Appellants' counsel phoned and left messages three or four times to DAII. DAII called their clients at 1:00 p.m., but did not return Appellants' call until 4:00 p.m. It is unknown whether DAII left a message or spoke with Appellants'

---

[4] Pursuant to Evidence Code sections 455 and 459, we gave the parties notice of, and opportunity to object to, our intention to take judicial notice of Appellants' original complaint. No party filed objections. Therefore, we take judicial notice of the Appellants' original complaint. (Evid. Code, §§ 452, 459; *Kinney v. City of Corona* (2023) 99 Cal.App.5th 1, 13, fn. 6.)

Additionally, we note that the original complaint was filed after 9:00 p.m. the night before the December 9, 2020 foreclosure sale. Given the allegations of forgery, Appellants may well have obtained injunctive relief and avoided foreclosure had they filed the complaint earlier.

counsel or staff, and it is further unknown what DAII said. Nevertheless, the same day, DAII conducted a nonjudicial foreclosure sale and sold the Property.

On December 10, 2020, Appellants' counsel again attempted to communicate with DAII. Counsel said that they informed DAII that they had been trying to contact them and provided DAII with a copy of the complaint.

On January 5, 2021, DAII filed with the Merced County Recorder's Office the trustee's deed upon sale, which had been notarized on December 16, 2020.

## PROCEDURAL BACKGROUND

Appellants filed their original complaint on December 8, 2020, in which they alleged among other things that the Short Form and the Note were forgeries. Trial was eventually set for March 2023.

Prior to trial, the Stepgrandchildren did not appear and were held in default.

On March 13, 2023, Appellants filed a nonsuit motion against the Stepgrandchildren on all claims and filed a nonsuit against DAII on the claims of quiet title and setting aside the foreclosure sale. The trial court granted both of Appellants' motions for nonsuits.

Also on March 13, 2023, DAII filed a motion for nonsuit on the claims against it. DAII argued that granting the nonsuit was appropriate because it was entitled to immunity as provided by Civil Code section 2924, subdivision (d).[5] The court denied the motion and found that a jury would be necessary to resolve competing inferences.

On March 15, 2023, trial began. At the conclusion of Appellants' opening statement, DAII made a motion for nonsuit. The trial court agreed that Appellants' opening statement was deficient and permitted them to make a second opening statement. At the conclusion of the second opening statement, DAII again moved for nonsuit based

---

[5] All further undesignated statutory references are to the Civil Code unless otherwise noted.

5.

on insufficient evidence of malice, among other things. After a recess, the court granted DAII's motion and concluded that Appellants had failed to identify facts in their opening statement that would show actual malice. As part of a written order issued the same day, the court faulted Appellants for focusing on a negligence standard instead of the appropriate standard for actual malice. The court also faulted Appellants for failing to describe issues concerning the September 4, 2020, communication log entry with WFG and the July 10, 2020 letter from counsel to DAII that predated the foreclosure sale by five months.

In May 2023, Appellant filed a notice of appeal.

## DISCUSSION

### I. Section 47 Immunity at Issue

In a nutshell, section 2924, subdivision (d) provides that a trustee's communications and actions that are necessary to conduct a nonjudicial foreclosure sale are privileged pursuant to "[Civil Code] section 47." (§ 2924, subd. (d); *Schep v. Capital One, N.A.* (2017) 12 Cal.App.5th 1331, 1336–1337 (*Schep*).) The purpose of extending section 47 immunity to a deed of trust trustee is to provide trustees with a certain measure of protection from tort liability that might otherwise arise from the performance of their statutory duties. (*Schep*, at p. 1336; *Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 340 (*Kachlon*).) However, section 47 contains an absolute privilege (the litigation privilege) under subdivision (b) and a qualified privilege (the common interest privilege) under subdivision (c) (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 360), and section 2924, subdivision (d) does not specify which of section 47's two immunity provisions applies to trustees. (*Schep*, at p. 1337; *Kachlon*, at pp. 335–336.)

There is a split of authority as to which type of section 47 immunity applies to a trustee's actions during a nonjudicial foreclosure. (*Schep*, *supra*, 12 Cal.App.5th at p. 1337.) One court has stated that absolute immunity applies (*Garretson v. Post* (2007)

6.

156 Cal.App.4th 1508, 1517–1518 (*Garretson*)), while another court has concluded that qualified immunity applies (*Kachlon*, *supra*, 167 Cal.App.4th at pp. 333, 336–341). Appellants urge us to follow *Kachlon* while DAII urges application of *Garretson* (but alternatively argues that it is entitled to qualified immunity as explained by *Kachlon*).

In *Garretson*, a series of disputes arose between the plaintiff and the defendant involving the sale of land, and the defendant initiated nonjudicial foreclosure proceedings. (*Garretson*, *supra*, 156 Cal.App.4th at p. 1513.) After the plaintiff paid off the amount necessary to stop foreclosure, he brought suit against the defendant for among other things wrongful foreclosure and breach of contract. (*Id.* at pp. 1513–1514.) The defendant responded by filing an anti-SLAPP motion, which was denied by the trial court. (*Id.* at p. 1514.) On appeal, the Fourth District ultimately affirmed the denial of the anti-SLAPP motion because the nonjudicial foreclosure process did not constitute SLAPP protected speech. (*Id.* at p. 1513.) The defendant in part relied on similarities between the SLAPP statute and immunity under section 47 (as provided by § 2924, subd. (d)) to argue that foreclosure activity was protected by the SLAPP statute. (*Garretson*, at p. 1517.) Without citation to authority, the *Garretson* court noted that "section 2924, subdivision (d) provides that a creditor's nonjudicial foreclosure activity constitutes privileged communications under the litigation privilege (Civ. Code, § 47, subd. (b))." (*Ibid.*) *Garretson* rejected the conclusion that "conduct deemed communicative for purposes of … section 47 automatically qualifies as constitutionally protected speech under section 425.16." (*Ibid.*) *Garretson* then discussed some of the legislative history of section 2924, subdivision (d):

> "The Legislature's rationale for extending the litigation privilege in … section 2924 to nonjudicial foreclosures was to protect trustees in the performance of their contractual and statutory duties. The proponents of the original amendment to Civil Code section 2924 in 1996 commented that 'Trustees who record and send notices of default and of sale can be vulnerable to defamation suits despite the fact that when the same allegations are made in the context of a judicial foreclosure, they are clearly

7.

privileged communications.  This appears to be because *a nonjudicial foreclosure is a private, contractual proceeding, rather than an official, governmental proceeding or action*.  Essentially, the required communications of default are the same and made for the same purpose.' " (*Garretson*, at p. 1518.)

In *Kachlon*, a deed of trust trustee was alleged to have been negligent and slandered a plaintiff's title to property during the course of nonjudicial foreclosure proceedings.  (*Kachlon*, *supra*, 168 Cal.App.4th at pp. 324, 333–334.)  The trial court granted a directed verdict and a motion for judgment notwithstanding the verdict in favor of the trustee based on section 47 immunity.  (*Kachlon*, at p. 333.)  The Second District examined the duties of a deed of trust trustee, the legislative history behind section 2924, subdivision (d), the *Garretson* decision, and the statutory nonjudicial framework, and ultimately concluded that section 2924, subdivision (d) incorporated the common interest privilege of section 47, subdivision (c).  (*Kachlon*, at pp. 334–341.)  *Kachlon* noted that a deed of trust trustee acts as a common agent to both the trustor and the beneficiary, and the trustee's duties are defined by statute and the language of a deed of trust.  (*Id.* at p. 335.)  *Kachlon* also explained that the legislative history behind section 2924, subdivision (d) was "not at all clear," despite what might have been concluded in *Garretson*.  (*Kachlon*, at pp. 337–338.)  In particular, the Senate author of the amendment twice explained that truthful communications made without malice and within the nonjudicial forfeiture context were privileged under section 47, which clearly invokes the common interest privilege.  (*Kachlon*, at p. 338.)  Because neither the plain language of section 2924, subdivision (d), nor the legislative history behind that statute clearly revealed which section 47 privilege was intended to apply, the *Kachlon* court applied "reason, practicality, and common sense" to resolve the question.  (*Kachlon*, at pp. 338– 339.)  *Kachlon* concluded that the common interest privilege was a "natural fit" for section 2924, subdivision (d), because the trustee's duties involve a series of communications to interested parties and potentially interested parties regarding default

and the sale of real property.  (*Kachlon*, at p. 339.)  Because nonjudicial foreclosure is a type of private proceeding between private individuals, it is neither a "judicial proceeding" nor an "official proceeding authorized by law."  (*Ibid.*)  *Kachlon* further explained:

> "[T]the 1996 amendment was intended to give trustees some measure of protection from tort liability arising out of the performance of their statutory duties. The overall balance of interests reflected in the statutory scheme, however, favors protection of trustors' property rights, thus suggesting that trustors should not be entirely deprived of the ability to vindicate their property rights if wrongfully violated by the trustee. Granting absolute immunity from such wrongdoing would wholly sacrifice the trustor's interest in favor of the trustee. The qualified common interest privilege, on the other hand, would provide a significant level of protection to trustees, leaving them open to liability only if they act with malice. At the same time, it preserves the ability of trustors to protect against the wrongful loss of property caused by a trustee's malicious acts."

> "Moreover, the plain language of the 1996 amendment grants privilege protection not only to trustees, but also to beneficiaries insofar as they may act as trustees. Section 2924 (at the time of the 1996 amendment and now) expressly permits the *beneficiary*, as well as the trustee, to record the notice of default which commences the nonjudicial foreclosure process. [Citation.]  Indeed, the beneficiary may act as trustee and enforce the trustee's authority under a deed of trust, including the power of sale (although this is uncommon).  [Citations.]  Thus, the plain meaning of the 1996 amendment makes the recording of the notice of default by the beneficiary, and any other statutorily authorized act of the beneficiary acting as trustee, a privileged communication under section 47.  It is difficult to believe that the Legislature intended to immunize the beneficiary (the creditor under the deed of trust) from even a *malicious* initiation of nonjudicial foreclosure that might wrongfully deprive the trustor of the property that secures the debt."  (*Id.* at pp. 340–341, fn. omitted.)

For these reasons, *Kachlon* concluded that section 2924, subdivision (d) incorporated the qualified common interest privilege of section 47, subdivision (c).  (*Kachlon*, at p. 341.)

There is no question that section 2924, subdivision (d) is silent as to which of section 47's two privileges apply to a deed of trust trustee.  We agree with *Kachlon* that

9.

section 2924, subdivision (d)'s legislative history is ambiguous as to which section 47 immunity is intended. We also agree with *Kachlon*'s reasoning that section 47, subdivision (c)'s qualified common interest privilege is the natural and appropriate fit for the nonjudicial foreclosure scheme. We find particularly compelling *Kachlon*'s observation that a "nonjudicial foreclosure sale" involves a series of communications between interested parties, and by definition does not involve any judicial proceeding or other "official proceeding authorized by law." Moreover, as observed by *Kachlon*, granting trustees absolute immunity would mean that a trustor has no recourse against an unscrupulous trustee who acts with malice to deprive or attempt to deprive the trustor of his property. Malicious conduct by its very nature is atypical, goes beyond mere negligence, and is anathema to the notion of a trustee acting as a common agent (albeit with limited duties) to both the beneficiary/creditor and the trustor/debtor; it has no place within the nonjudicial foreclosure scheme. To grant a trustee absolute immunity for even acts performed with actual malice could well undermine public confidence in the nonjudicial foreclosure process. On the other hand, granting a trustee the qualified immunity of section 47, subdivision (c) strikes the appropriate balance between providing protections for trustees who engage in conduct akin to negligence (thus providing a measure of protection) and ensuring that a trustee whose conduct rises to the level of actual malice will be subject to liability. Therefore, for the reasons articulated by *Kachlon*, we conclude that the immunity provided by section 2924, subdivision (d) is the qualified common interest immunity of section 47, subdivision (c). (*Kachlon*, *supra*, 168 Cal.App.4th at pp. 334–341.)

## II. Propriety of Nonsuit after Opening Statement

### A. *Parties' Arguments*

Appellants argue that the trial erred by granting the renewed nonsuit. Appellants contend that during their second opening statement, counsel identified over 100 facts that

collectively amounted to substantial evidence of actual malice. Among these facts were communications and attempted communications about forgery and the invalidity of the debt, "red flag" problems with the Note and Short Form, and communications with WFG that expressed concerns over title validity.

DAII argues that the trial court correctly granted the renewed nonsuit. DAII contends that the Appellants' opening statement relied on a negligence standard and attempted to make it vicariously liable for the actions of the Stepgrandchildren. DAII argues Appellants' counsel did not identify evidence that sufficiently showed prior knowledge of fraud or that rose to the level of actual malice. DAII argues that the July 2020 letter from Appellants' counsel is a fabrication and that discussions with WFG involved whether there were one or two signatures on the Short Form. Finally, DAII argues that it was not served with the complaint until March 2021, which was well after the foreclosure sale. DAII avers that it is not uncommon for attorneys to attempt to contact trustees, but in the absence of an actual court order, trustees are under no obligation to act with respect to such calls.

## B. *Additional Background*

### 1. First Opening Statement

Appellants' first opening statement was general in nature. Counsel discussed the relevant family history and the general scheme of the Stepgrandchildren to utilize a forged promissory note and deed of trust to improperly foreclose on Appellants' home. Appellants also discussed the claims that they were pursuing, the witnesses they intended to call, that the case would be document intensive, but that they would attempt to be as efficient as possible. Appellants also mentioned malice, problems with some of the forged documents, and what DAII was told by third parties, but they did so without mentioning many details.

11.

## 2. Second Opening Statement

Appellants' second opening statement was considerably longer and more detailed due to DAII's motion for nonsuit. Appellants' counsel explained that the case was about a forged promissory note and a forged deed of trust and that, given DAII's 33 years of experience in the industry, DAII knew there was a problem with these documents. In part, Appellants' counsel then described the following facts: (1) DAII was retained in 2019 and charged for file research, research on the note, and sending notices; (2) one item in DAII's file was a letter from Kaur dated sometime in 2018 that stated, "I have no knowledge of this debt. What are you talking about?"; (3) there were significant problems with the forged promissory note, including missing necessary provisions regarding balloon payments, interest calculations that do not match the maturity date, and dates of recordation and execution that are not consistent with a 2009 home purchase; (4) there were significant problems involving the Short Form, including an improper notarization and incorporation of the provisions of the nonexistent fictitious deed; (5) DAII's communications log with WFG show that there were concerns about title and the notices sent by DAII; (6) the title insurance issued by WFG had relevant exceptions; (7) the trustee's deed upon sale was notarized on December 16, 2020; (8) Appellants' counsel sent a letter in July 2020 in which Appellants denied all knowledge of the debt; (9) Appellants filed suit on December 8, 2020, and called DAII multiple times on December 9, 2020, before the sale, but DAII apparently did not respond; (10) Appellants' counsel emailed DAII on December 10, 2020, that he had been trying to reach DAII and attached a copy of the complaint, but DAII apparently did not respond and instead faxed the complaint to their clients; and (11) that the foreclosure sale could have been unwound by DAII but was not.

12.

## C. *Legal Standards*

### 1. Nonsuits after Opening Statements

A defendant may move for nonsuit after the plaintiff's opening statement. (*Carachure v. Scott* (2021) 70 Cal.App.5th 16, 25 (*Carachure*); *Ewing v. Northridge Hospital Medical Center* (2004) 120 Cal.App.4th 1289, 1296.) However, granting a nonsuit following a plaintiff's opening statement is a disfavored procedure. (*Carachure*, at p. 25; *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1594.) A nonsuit after the opening statement is properly granted only if there is no evidence of sufficient substantiality, i.e. the proffered evidence would not constitute substantial evidence, to support a verdict in the plaintiff's favor. (See *Willis v. Gordon* (1978) 20 Cal.3d 629, 633; *Hamilton v. Gage Bowl, Inc.* (1992) 6 Cal.App.4th 1706, 1710.) In order to determine whether a nonsuit after opening statement was appropriately granted, the reviewing court accepts as true all of the plaintiff's asserted/proffered facts, indulges in every reasonable inference in the plaintiff's favor, and resolves all disputes and presumptions in favor of the plaintiff. (See *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291; *Carachure*, at p. 25; *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 539; *Ewing*, at p. 1296.) The granting of a nonsuit is reviewed de novo. (*Carachure*, at p. 25; *McMillin Companies,* at p. 539.)

### 2. Section 47 Qualified Immunity

Section 47, subdivision (c) immunizes a person's statement to others on matters of common interest from liability in tort so long as the person did not act with malice. (§ 47, subd. (c); *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1196.) The defendant bears the initial burden of establishing that a statement was made on a privileged occasion, and then the burden shifts to plaintiff to establish the statement was made with malice. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 721; *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 949.) The malice required to defeat section 47 qualified immunity is " 'actual malice.' " (*Taus*, at p. 721.; *King v. U.S. Bank National Assn.* (2020)

13.

53 Cal.App.5th 675, 701 (*King*).) A plaintiff may demonstrate actual malice in one of two ways: (1) the defendant's motivation in a making a publication was that of hatred and ill will towards the plaintiff; or (2) the defendant lacked reasonable grounds for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights. (*Taus*, at p. 721; *King*, at p. 701.) Depending on the circumstances, a number of factors may inferentially show actual malice, including: the purposeful avoidance of the truth, failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable or biased against the plaintiff, and the existence of obvious reasons to doubt the veracity of information or source for a statement. (*King*, at pp. 701–702; see also *Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 221 (*Mitchell*).) However, simply because one of these factors may alone exist does not necessarily mean it will be sufficient to support a finding of actual malice. (*Mitchell*, at p. 221.) Further, mere negligence, even with respect to the sufficiency of an investigation, does not constitute actual malice. (*Kachlon*, *supra*, 168 Cal.App.4th at p. 344.)

### D.  *Analysis*

#### 1.  Avoidance of the Truth

Appellants' evidence demonstrates that DAII ignored multiple instances in which Appellants indicated or expressly alleged forgery and denied having any knowledge whatsoever of the Note or the Short Form. Through its billing activity of "file research," it can be inferred that DAII was aware of Kaur's 2018 letter in which she denied knowledge of any debt. That denial was confirmed through her counsel's July 2020 letter in which counsel expressly denied that Appellants had any knowledge of the debt or the Short Form.[6] There is no indication that DAII responded to the July 2020 letter. Both of

---

[6] We note that the trial court's written order stated that Appellants' counsel did not mention his July 10, 2020 letter to DAII in the second opening statement. However, the transcript reveals that this finding is incorrect.

14.

these denials implicate a possible forgery.  Further, on the day of the foreclosure, Appellants' counsel attempted to speak with DAII multiple times about the complaint that had been filed the day prior and that expressly alleged that the Note and Short Form were forgeries.  Finally, the day after the sale, Appellants' counsel again attempted to contact DAII and sent them a copy of the complaint which expressly alleged forgery.  The second opening statement did not identify any responses by DAII or attempts to communicate with Appellants' counsel.  Instead, the opening statement suggests that DAII essentially ignored the attempted communications and assertions of forgery.  By failing to meaningfully communicate with Appellants' counsel, DAII insulated itself from learning additional facts demonstrating forgery.[7]  Therefore, viewed in the light most favorable to Appellants and making all reasonable inferences in their favor (*Carachure*, *supra*, 70 Cal.App.5th at p. 25), a reasonable jury could conclude that DAII avoided the truth,

---

We further note that DAII argues in opposition, but without citation to the record, that its internal records indicate that the July 10 letter from Appellants' counsel was never received and was in fact a fabrication.  However, within the context of a nonsuit, and given Appellants' reliance on the letter, we are not required to accept the accuracy of DAII's records.  We are, however, required to accept Appellants' position that the letter was not a fabrication and was sent and received around July 10, 2020.  (*Carachure*, *supra*, 70 Cal.App.5th at p. 25.)  In denying DAII's written motion for nonsuit, the trial court held that it would be up to the jury to determine whether the July 10 letter was sent on July 10 and subsequently received by DAII or was instead a fabrication.  We agree with the trial court on this point.

[7] For example, we believe that it is likely that Appellants' counsel would have been able to convey to DAII that the fictitious deed described with precision in the Short Form was not in the Merced County Recorder's records and did not actually exist.  Further, in a prior related appeal involving attorney fees, it was represented that Pabla was in India the day that the notary supposedly witnessed her sign the Short Form and Note in California (August 2, 2013).  (*Kaur v. Pabla* (May 14, 2024, F086273) [nonpub. opn.].)  Both of these facts would severely undercut the legitimacy of the Short Form and the Note, as well as the reasonableness of any belief that DAII may have had regarding its ability to conduct a foreclosure sale.

15.

and learning about the truth, of the forgeries despite the active efforts of Appellants (*Mitchell*, *supra*, 70 Cal.App.5th at p. 221; *King*, *supra*, 53 Cal.App.5th at p. 701).

Appellants' opposition to DAII's pretrial motion for nonsuit does indicate that DAII called Appellants' counsel at 4:00 p.m. on December 8, 2020, after counsel had left four prior messages. However, Appellants do not indicate whether a conversation ever occurred or whether DAII merely left a message that it was returning counsel's prior calls "as a courtesy." Further, DAII does not discuss this portion of Appellants' opposition as part of its responding brief, which suggests that the call was of minimal (if any) significance. Within the context of a nonsuit following opening statement, we cannot conclude that this nondescript end of the day return phone call is sufficient as a matter of law to negate a potential finding of avoidance. (Cf. *Carachure*, *supra*, 70 Cal.App.5th at p. 25 [discussing presumptions in favor of the nonmoving party within the context of a motion for nonsuit].)

We recognize that during the second opening statement, DAII objected to the December 10, 2020 communication as irrelevant because it postdated the foreclosure sale.[8] We disagree with DAII's premise that post-sale events are per se inadmissible as irrelevant. The trustee's acceptance of a final bid is *generally* the point at which a foreclosure sale is deemed complete. (*Millenium Rock Mortgage, Inc. v. T.D. Service Co.* (2009) 179 Cal.App.4th 804, 809 (*Millenium Rock*); 5 Miller & Starr, Cal. Real Estate (4th ed. 2024) Deeds of Trust and Mortgages, § 13.250 (Miller & Starr).) However, prior to the actual delivery of the trustee's deed upon sale to the purchaser, the trustee retains the power to rescind the sale under limited circumstances. (*Millenium Rock*, at p. 809; Miller & Starr, at § 13.250.) "If facts are discovered by the trustee that allows an attack on the validity of the sale [such as fraud], the trustee may abort the sale, and return any

---

[8] The trial court permitted the statement to stand for "a limited purpose," which appeared to be that Appellants were attempting to communicate with DAII before the trustee's deed upon sale was delivered to the buyer.

16.

funds received to the purchaser .…" (Miller & Starr, at § 13.250, fn. omitted; *Millenium Rock*, at p. 809.) It is clear that forged documents are a form of fraud. As forgeries, the Note and Short Form are utterly void and incapable of conveying a valid title; they completely invalidate every aspect of the foreclosure process on Appellants' home, including the actual sale. (See *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 890; *La Jolla Group II v. Bruce* (2012) 211 Cal.App.4th 461, 478, fn. omitted ["Since the second deed of trust was a forgery and was void, appellants received no title by it"].) Because the deed upon sale was notarized on December 16, 2020, it is reasonably inferred that the deed was given to the buyer no sooner than that date. This is six days after DAII received the last communication from Appellants' counsel, which included the actual filed complaint that alleged forgery. Because the deed upon sale had not been given to the buyer before the December 10 communication from Appellants' counsel, DAII was still able to rescind the sale. (Miller & Starr, at § 13.250; *Millenium Rock*, at p. 809.) Thus, contrary to DAII's objection, the December 10 communication has significant relevance even though it postdates the foreclosure sale.

We also recognize that a deed of trust trustee is not a true trustee in the sense that it owes fiduciary duties to the trustor or the beneficiary. (*Kachlon*, *supra*, 168 Cal.App.4th at p. 333.) Instead, the duties of the deed of trust trustee are those limited duties imposed by statute and the terms of a particular deed of trust. (*I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 287.) Those duties do not ordinarily include a general obligation to investigate. (*Citrus El Dorado, LLC v. Chicago Title Co.* (2019) 32 Cal.App.5th 943, 949.) Nevertheless, we do not think that the absence of a general duty to investigate means that a trustee is thereby given the prerogative to completely ignore communications and evidence that demonstrate a fatal flaw in the foreclosure process, such as forgery. Appellants' second opening statement indicates that DAII ignored the 2018 letter from Kaur which was indicative of forgery, the July 2020 letter from Appellants' counsel which was indicative of forgery, and the

17.

December 2020 complaint which expressly stated that the Note and Short Form were forgeries. Instead, Appellants' second opening statement suggests that DAII affirmatively chose not to address these matters or meaningfully communicate with counsel, thereby insulating itself from additional evidence that could and likely would have been provided by counsel and which would have negated DAII's ability to proceed with foreclosure. California authority recognizes that once a trustee learns of fraudulent activity, it can rescind a foreclosure sale so long as the deed upon sale has not been delivered to a purchaser. (Miller & Starr, *supra*, at § 13.250; *Millenium Rock*, *supra*, 179 Cal.App.4th at p. 809.) Therefore, while there may not be a general duty to investigate, that does not mean that there can necessarily be no consequences to a trustee who avoids a trustor's evidence, or attempts to present evidence, of fatal irregularities. (Cf. *Mitchell*, *supra*, 70 Cal.App.5th at p. 221; *Millenium Rock*, at p. 809; Miller & Starr, at § 13.250.)

### 2.    Obvious Reasons to Distrust

Appellants' counsel explained to the jury that there were significant and obvious problems with the Note, including irregularities with recordation, the statutory requirements for a valid balloon payment, and the interest calculations. Counsel also noted irregularities with respect to the Short Form's notarization, which could suggest forgery. Counsel stated that an expert witness would explain to the jury in more detail what the deficiencies with the Note and Short Form were, what the significance of the deficiencies were, and how the deficiencies would have been obvious to an experienced trustee like DAII.[9] Considering that DAII billed for a review of the file and at least the Note, and that DAII had 33 years of nonjudicial foreclosure experience, it can reasonably

---

[9] We emphasize that we read the opening statement as attempting to describe *obvious* problems and irregularities, not merely irregularities that could have been *negligently* overlooked. If a jury determines that the issues with the Short Form and Note were not obvious, then DAII would merely be negligent in this respect, and negligence is not the same as actual malice. (*Kachlon*, *supra*, 168 Cal.App.4th at p. 344.)

18.

be inferred that DAII was actually aware of obvious deficiencies in both the Note and the Short Form. Those obvious deficiencies would constitute reasons to doubt the representations of the Stepgrandchildren regarding the validity of the Note and the Short Form.

### 3. Communications with WFG

Appellants' counsel informed the jury that WFG expressed concerns with the title and initially refused to issue a policy. Counsel referenced the contents of DAII's communication logs and pointed out that the policy WFG ultimately issued contained exceptions for challenges to the validity of title. Counsel did not identify further details about the communications that DAII had with WFG or fully explain WFG's concerns with title. Nevertheless, as indicated above, just days prior to the opening statements, Appellants' opposition to DAII's written motion for nonsuit identified a specific entry from DAII's September 4, 2020 communication log. The log entry indicated that DAII called WFG and went over "the vesting issue." According to the entry, DAII asked if there was a title issue on the Short Form, whether there would be a cloud on the title, and "did the owners of record sign [the deed of trust]." WFG responded to the effect that it was good that more than one person executed the deed of trust, if only one person had signed DAII would be "looking at percentages," and that there would be no cloud on the title.

The key portion of this log entry relates to the inquiry about whether the owners of record signed the deed of trust. Although DAII strenuously denies this interpretation, in light of the July 10, 2020 letter from counsel, it is not unreasonable to interpret this portion of the log entry as a question about whether Dalip and Pabla actually signed the Short Form, which relates to forgery. The answer reflected in the log entry does not clearly indicate that WFG confirmed Dalip and Pabla actually signed the Short Form or concluded that there were no forgeries. Appellants contend that the passage indicates that if there was only one signature, there might be a problem with insurance due to the

danger of forgery. The trial court previously found that this passage when combined with the July 10, 2020 letter could support an inference that DAII was aware of forgery issues, yet improperly decided to weigh "the percentages" and proceed with foreclosure. Although Appellants' description to the jury of the communications between DAII and WFG were not as detailed as they could have been, we believe that it is appropriate to interpret Appellants' statements in light of their prior written opposition to nonsuit. So, reading the opening statement, the September 4 log entry was placed at issue by Appellants, and under their interpretation of that entry, WFG did not negate forgery.[10]

Relying on *Kachlon*, DAII argues that it could not have acted with malice as a matter of law because it sought and obtained title insurance from WFG. *Kachlon* ultimately held that a deed of trust trustee was entitled to prevail through the qualified common interest privilege of section 47, subdivision (c). (*Kachlon*, *supra*, 168 Cal.App.4th at p. 344.) With respect to malice, the plaintiffs alleged that the trustee had failed to ensure that the debt on the note remained outstanding and failed to rescind the foreclosure sale upon being presented with evidence that the debt had been repaid. (*Id.* at p. 343.) The *Kachlon* court held that there was insufficient evidence of actual malice. (*Id.* at p. 344.) *Kachlon* explained that the trustee had obtained a trustee's sale guaranty that indicated the deed of trust remained recorded and, after realizing that the

---

[10] We note that DAII's responding brief contends that the inquiry about the Short Form was whether there were two signatures on the Short Form and that the "percentages phrase" was a reference to percentage of ownership. DAII's first point is not particularly satisfactory as the Short Form clearly contains two signatures; merely inquiring about the number of signatures therefore would seem unnecessary. Second, DAII's interpretation of the communication log is not necessarily unreasonable. Nevertheless, we cannot hold that DAII's suggested interpretation is the *only* reasonable interpretation, particularly in the context of a nonsuit following opening statement. (*Carachure*, *supra*, 70 Cal.App.5th at p. 25.) Once again, we agree with the trial court's ruling on DAII's written motion for nonsuit – it will be up to the jury to decide how to interpret the September 4 communication log entry.

trustor and beneficiary disputed whether the debt remained unpaid, the trustee took no further action to either rescind the trustee's sale or finalize the sale. (*Ibid.*)

In our case, Appellants' opening statement does not indicate that WFG's communications with DAII, or the policy it issued to DAII, adequately addressed the issue of forgery. Further, as indicated above, viewed in the light most favorable to Appellants, the evidence described by Appellants' counsel could support a finding that DAII purposefully avoided either the forgeries or learning about the forgeries from Appellants' counsel, and there were obvious problems with both the Note and Short Form that would undercut reliance on the representations of the Stepgrandchildren. Finally, instead of acknowledging a critical problem and at least freezing the sale as did the trustee in *Kachlon*, DAII finalized the sale without further meaningful communication with Appellants. Again, under the review required by a nonsuit following opening statement (*Carachure*, *supra*, 70 Cal.App.5th at p. 25), the circumstances in this case are distinguishable from the circumstances in *Kachlon*.

### 4. Sufficiency of the Evidence Identified in the Second Opening Statement

There are a number of considerations that may inferentially support a finding of actual malice. As discussed above, Appellants' counsel described evidence that could support findings that DAII avoided the truth that the Note and Short Form were forgeries, despite the efforts of Appellants. Further, Appellants' counsel identified significant irregularities with the Note and Short Form that allegedly would have been obvious to DAII as an experienced trustee. Finally, the communications described by Appellants' counsel between DAII and WFG indicate that there were title concerns, the policy at issue contained relevant exclusions, and the issue of forgery was brought up and not adequately dispelled. Although a close question, viewing this evidence in the light most favorable to Appellants, (*Carachure*, *supra*, 70 Cal.App.5th at p. 25), we conclude that

21.

this evidence collectively[11] is sufficiently substantial that a jury could (but would not necessarily be required to) find actual malice by DAII because DAII did not have a reasonable basis to believe that they had the ability to conduct a foreclosure sale.[12]

## **DISPOSITION**

The trial court's order granting Respondent's motion for nonsuit is reversed. This case is remanded to the Merced County Superior Court for proceedings consistent with this order. Appellants are awarded their costs on appeal.

POOCHIGIAN, Acting P. J.

WE CONCUR:


FRANSON, J.


SNAUFFER, J.

---

[11] We emphasize that our determination is based on the totality of the evidence as described by Appellants' counsel. We make no determinations about whether anything less than the evidence described would have been sufficiently substantial to warrant a denial of DAII's renewed motion for nonsuit.

[12] We note that the standard for establishing actual malice remains high, and the difficult burden of showing actual malice by DAII remains with Appellants. The analysis of this order of necessity relies heavily on the representations made by Appellants' counsel during the second opening statement. Whether the evidence presented to a jury will actually conform to the descriptions made is a question that cannot be answered in this appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JASWINDER KAUR et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>DUAL ARCH INTERNATIONAL, INC., et al.,<br><br>Defendants and Respondents. | F086272<br><br>(Merced Super. Ct.<br>No. 20CV-03476)<br><br><br>**ORDER GRANTING REQUESTS<br>FOR PUBLICATION** |

On November 26, 2024, and December 6, 2024, this court received and filed requests for publication of the nonpublished opinion filed on November 15, 2024, in the above-entitled matter. It appearing that part of the nonpublished opinion meets the standards for publication specified in the California Rules of Court, rule 8.1105(c)(5) and (c)(6), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the exception of part II. of the Discussion.


POOCHIGIAN, Acting P. J.


WE CONCUR:


FRANSON, J.


SNAUFFER, J.


1.