Filed 11/17/25  Guarino v. Tauber CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SEAN GUARINO, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> JACOB TAUBER, <br><br> Defendant and Respondent. | B331372 <br><br> (Los Angeles County Super. Ct. No. 20STCV19926) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank M. Tavelman, Judge.  Affirmed.

SLC Law Group and Louis F. Teran for Plaintiff and Appellant.

Schmid & Voiles, Denise H. Greer, Rodney G. Tomlinson and Adam R. James for Defendant and Respondent.

———————

Sean Guarino appeals from a judgment entered after the trial court granted Jacob Tauber, M.D.'s motion for summary judgment. Guarino sued Dr. Tauber for medical malpractice with respect to Dr. Tauber's performance of a full right hip replacement. Guarino later underwent a "revision" hip surgery with another doctor, replacing the prosthetic implant Dr. Tauber placed during the earlier surgery.

Guarino contends the trial court erred in finding the medical expert declaration Dr. Tauber submitted with his summary judgment motion met Dr. Tauber's initial burden with respect to his alleged breach of the standard of care. Guarino also contends the court erred in finding Guarino did not meet his burden to create a triable issue of fact without an expert declaration, and further, the court abused its discretion in excluding Guarino's declaration (stating his right leg shortened by two inches following Dr. Tauber's surgery) and the second surgeon's operative report. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Guarino's Injuries and Treatment Before Dr. Tauber's Surgery*

In 2005 Guarino underwent two surgeries to address a right hip fracture he suffered after a motorcycle accident. Among other things, the surgeries involved placement of prosthetic metallic pins and other metallic hardware in Guarino's hip and its surrounding bone.

On June 8, 2017 Guarino was in a high-speed car accident that exacerbated his pre-existing hip condition, causing severe and constant pain to his right hip. For approximately the next

2

nine months, Guarino received chiropractic treatment and steroid injections from a pain specialist to treat his hip pain.

In March 2018 Guarino consulted with Jeffrey Olsen, M.D. At the time of his visit, Guarino was walking with a severe limp. He reported his hip pain had become "'out of control'" since the 2017 accident. Dr. Olsen recommended Guarino continue his current pain medication regimen and seek a surgical evaluation and treatment for a revision or reconstruction of the metallic hardware that had been placed in his right hip following the 2005 accident.

B.    *Dr. Tauber's Surgery*

On April 17, 2018 Guarino had a consultation with orthopedic surgeon Dr. Tauber. Dr. Tauber observed that Guarino experienced "[p]ain with internal rotation about the right hip." He also observed a "[p]ositive Trendelenburg,"[1] a positive straight leg raise, "right hip retained hardware," and an "irregularity [of the] femoral head." Dr. Tauber discussed with Guarino surgical intervention on his right hip.

Guarino returned to Dr. Tauber on August 16, 2018 for a re-evaluation. Dr. Tauber noted Guarino's continued pain when moving his right hip, and X-rays of Guarino's hip revealed "retained hardware" and "bony prominences." Dr. Tauber also noted that a CT scan documented "arthritic disease of [Guarino's]

---

[1]    "A positive Trendelenburg sign usually indicates weakness in the hip abductor muscles . . . . A contralateral pelvic drop during a single-leg stance defines a positive sign." (Gogu & Gandbhir, *Trendelenburg Sign* (Nov. 14, 2022) National Institute of Heath: National Library of Medicine <https://www.ncbi.nlm.nih.gov/books/NBK555987> [as of Nov. 14, 2025].)

hip." Dr. Tauber recommended arthroscopic hip surgery with hardware removal to reduce the pain from the retained hardware. Dr. Tauber recommended Guarino obtain a second opinion from Jonathan Nassos, M.D., who performs arthroscopic hip surgery.

On October 9, 2018 Guarino visited Dr. Nassos. Dr. Nassos observed that Guarino experienced pain when rotating the right hip. He noted "[m]ild to moderate hip joint arthritic changes," "[c]ystic formation . . . in the femoral head," and "[o]steophyte formation . . . in the femoral head." Dr. Nassos concluded that "[d]efinitive management would include removal of hardware and right total hip arthroplasty," and referred Guarino back to Dr. Tauber.

On November 28, 2018 Dr. Tauber performed a right total hip replacement surgery on Guarino at Silver Lake Medical Center. The surgery entailed replacing Guarino's natural hip with a metallic hip prosthetic and removing embedded hardware and extensive heterotopic bone (formation of bone in a joint). Dr. Tauber's operative report stated that as part of the procedure, "[a] size 3 stem, short neutral neck, 38[-millimeter] ceramic head, and extra-long sleeve would be used to provide restoration of leg length and excellent stability." Dr. Tauber noted that "[a]t the completion of the procedure, range of motion and stability appeared to be excellent."

C.   *Follow-up to Dr. Tauber's Surgery and Dr. Snibbe's Revision Surgery*

On December 18, 2018 Guarino returned to Dr. Tauber complaining of calf pain. Dr. Tauber obtained X-rays documenting the position of the hip replacement and referred Guarino for a duplex venous study to rule out a deep venous

4

thrombosis (a blood clot).  An ultrasound revealed Guarino had a deep venous thrombosis, and Guarino was treated with blood thinners and discharged.  He started physical therapy in January 2019.

On January 9 and February 6, 2019 Guarino received treatment from California Back and Pain Specialists and began physical therapy.  On February 19 he returned to Dr. Nassos for a follow-up.  Guarino was walking with a cane and complained of continued significant pain in his right hip.  Dr. Nassos referred Guarino to a total joint specialist.

On February 26, 2019 Guarino returned to Dr. Tauber for a further orthopedic consultation.  Guarino was still using a cane.  Dr. Tauber noted apparent "shortness of the right lower extremity" and stated Guarino had started therapy late due to the deep venous thrombosis.  Dr. Tauber recommended Guarino continue with physical therapy and "return to his office in one month."  This was Guarino's last visit to Dr. Tauber.

On May 13, 2019 Guarino visited orthopedic surgeon Jonathan Frank, M.D., who ordered additional X-rays to evaluate the prosthesis and other possible complications.  The doctor who reviewed the X-rays noted Guarino's "[r]ight total hip prosthesis [was] satisfactorily position[ed] without loosening."  On June 25 Dr. Frank noted the X-rays "show[ed] what appear[ed] to be shortening compared to the contralateral unaffected side.  There is potential for the stem to have resulted in some subsidence since the initial surgery, which may have resulted in [Guarino's] leg length discrepancy."  Dr. Frank further stated Guarino would need a revision hip replacement to address the leg discrepancy and continued pain.  He recommended Guarino see a surgeon who performed revision hip replacements.

On July 25, 2019 Guarino met with orthopedic surgeon Jason Snibbe, M.D.  Dr. Snibbe noted that X-rays taken that day revealed "vertical alignment [of the] acetabular component and subsidence of [the] femoral component leading to shortening of [Guarino's] right leg in comparison to his left."  Dr. Snibbe ordered a right hip CT scan and bone scan to evaluate Guarino for "mechanical loosening."  He recommended Guarino undergo another revision right total hip arthroplasty.  The doctor who reviewed the August 22, 2019 CT scan noted with respect to the status of Guarino's December 2018 hip replacement: "normal alignment, intact hardware, unchanged when compared to right hip radiographs on 6/12/2019."  Dr. Andy Wang's reading of the August 7, 2019 bone scan stated the findings in the scan were "compatible with loosening of the distal tip of the femoral stem part of the right hip prosthesis."

On October 2, 2019 Dr. Snibbe performed a revision total hip replacement surgery on Guarino at DOCS Surgical Hospital.  Dr. Snibbe's October 14, 2019 operative report noted Guarino's previous "implant with the femoral stem subsided, which caused significant shortening of his leg and was complicated.  This was not addressed by the initial surgeon properly and was allowed to heal in a poor position.  He ultimately has chronic pain . . . due to this improper alignment of the leg.  After analyzing him with a bone scan, it . . . showed that his femoral stem was grossly loose and also he had a shortening of his leg . . . ."  Dr. Snibbe further stated, "It is my opinion that need for this revision surgery is directly related to his accident."

Reports from Guarino's postoperative visits with Dr. Snibbe noted Guarino was doing well with his recovery.  By February 7,

2020 Guarino was walking without pain, and he continued with range of motion strengthening and movement exercises.

D. *The Complaint and Guarino's Discovery Responses*

Guarino filed this action against Dr. Tauber on May 26, 2020, alleging causes of action for medical malpractice and lack of informed consent.[2]  Guarino alleged that between approximately September 2018 and May 2019, Dr. Tauber negligently and carelessly examined, evaluated, diagnosed, treated, "care[d] for, observe[d], . . . attend[ed] to, follow[ed] up, and control[led] [Guarino]" with respect to his hip and hip replacement, which failed to conform to the standard of care normally practiced by medical professionals.  Guarino further alleged that, as a direct and proximate result of Dr. Tauber's conduct, he sustained personal injuries, was required to obtain additional medical care, and would need to obtain further care in the future.

On July 22, 2021 Guarino served responses to Dr. Tauber's first set of special interrogatories.  Special interrogatory Nos. 23 and 25 asked Guarino to state each fact and contention supporting his allegations of professional negligence.  To each question, Guarino responded that Dr. Tauber "improperly performed full hip replacement surgery," and that "the hip prosthetic implanted in [Guarino by Dr. Tauber] was improperly

---

[2]  In his responsive separate statement filed in the trial court, Guarino did not dispute he signed an informed consent form for Dr. Tauber's surgery, and he did not oppose the summary judgment motion on this cause of action.  Guarino likewise does not raise informed consent on appeal, thereby forfeiting any challenge to the grant of summary judgment on this cause of action.  We therefore only address the medical malpractice cause of action.

7

aligned, the wrong type and size, grossly loose, and had other issues" to be disclosed in further discovery.  Guarino stated in response to special interrogatory No. 24 that Dr. Tauber committed professional negligence on or around November 28, 2018 (the date of Dr. Tauber's surgery).

E.     *Dr. Tauber's Motion for Summary Judgment*

On October 18, 2022 Dr. Tauber filed his motion for summary judgment.  Dr. Tauber argued Guarino could not demonstrate a triable issue of material fact regarding breach of the standard of care or causation to support Guarino's medical malpractice cause of action.  Dr. Tauber submitted the declaration of orthopedic surgeon Stephen A. Mikulak, M.D., who was familiar with the standard of care for treating patients like Guarino who undergo a total hip replacement surgery. Dr. Mikulak reviewed the office charts from Paul Chiu, M.D. (Guarino's 2017 pain management specialist), Dr. Tauber, and Snibbe Orthopedics and medical records from UCLA Medical Center (where Guarino was treated in 2006), Silver Lake Medical Center (where Dr. Tauber performed the 2018 surgery), and DOCS Surgical Hospital (where Dr. Snibbe performed the 2019 surgery).  Dr. Mikulak also reviewed the radiographic studies (including X-rays and CT scans) performed from 2018 to 2019. Dr. Mikulak further reviewed Guarino's responses to special interrogatories and requests for production, and the transcripts from the depositions of Guarino and Dr. Tauber.

Dr. Mikulak opined Dr. Tauber complied with the applicable standard of care in treating Guarino.  Dr. Mikulak noted Guarino had a "7 [-millimeter] displacement based upon his initial 2005 surgery and the car accident of June 8, 2017." Dr. Mikulak concluded Dr. Tauber's "workup for the surgery was

8

proper" when Guarino presented to his office on April 17, 2018. Further, Dr. Tauber's operative report noted Guarino's range of motion and stability appeared to be excellent when the procedure was complete. Dr. Mikulak noted the postoperative X-ray showed anatomic alignment of the implanted prosthetic, and that "subsequent studies of December 18, 2018, June 12, 2019, and August 22, 2019" confirmed this alignment and showed there was no loosening, change in the implant itself, or change in the implant's subsidence from Dr. Tauber's surgery. Based on the radiographic imaging and Dr. Snibbe's subsequent surgery, Dr. Mikulak concluded Dr. Tauber appropriately selected the proper type and size of implant for Guarino's right total hip replacement. Dr. Mikulak noted Guarino had a 10-millimeter leg length discrepancy following Dr. Tauber's procedure, but he opined this discrepancy was within the acceptable limits following a procedure and not a breach in the standard of care.

F.    *Guarino's Opposition*

In his opposition, Guarino argued Dr. Tauber failed to meet his burden of proof because Dr. Mikulak's opinion that Guarino had a postoperative leg length discrepancy of 10 millimeters (approximately .4 inches) lacked a sufficient factual basis. Guarino further argued triable issues of material fact existed with respect to Dr. Mikulak's opinions that (1) Guarino's postoperative X-ray showed anatomic alignment of his prosthetic implant, and (2) Guarino's postoperative radiographic images confirmed there was no loosening or change in subsidence of the implant. To support his opposition, Guarino submitted Dr. Snibbe's October 14, 2019 operative report (attached to an attorney declaration) and Guarino's own declaration. Guarino averred, "After [Dr. Tauber's] surgical procedure, my right leg

9

began shortening in length slowly over time. A few months after the surgical procedure I was forced to use a cane due to the shortening of my leg. [¶] . . . [¶] On October 2, 2019, Dr. Snibbe removed the hip prosthetic implanted by Defendant in its entirety and implanted a new hip prosthetic. By this time, my leg had shortened by over 2 inches or 50 [millimeters]."[3]

G. *Dr. Tauber's Reply*

In his reply, Dr. Tauber argued Guarino did not create a triable issue of fact because he did not present expert testimony regarding the standard of care or causation, which was necessary to show professional negligence. Dr. Tauber also filed an evidentiary objection to Guarino's declaration, arguing the declaration contained inadmissible hearsay under Evidence Code section 1200. Dr. Tauber asserted that Guarino's declaration lacked foundation and evidentiary value because Guarino was not a medical expert, yet he purported to opine on the standard of care and causation.

---

[3] In his opposition Guarino requested a continuance of Dr. Tauber's motion pursuant to Code of Civil Procedure section 437c, subdivision (h), which the trial court denied. Guarino has forfeited any challenge to denial of the continuance by not raising the continuance in his appellate briefs. (*RAR2 Villa Marina Center CA SPE, Inc. v. County of Los Angeles* (2023) 91 Cal.App.5th 1050, 1070, fn. 13; *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 [""Issues not raised in an appellant's brief are deemed waived or abandoned""].)

10

H.    *The Trial Court's Ruling and Entry of Judgment*

After a hearing, on May 23, 2023 the trial court granted Dr. Tauber's summary judgment motion.  The court sustained Dr. Tauber's objection to Guarino's declaration.  With respect to Guarino's medical malpractice cause of action, the court explained a defendant is entitled to summary judgment based on an expert declaration opining that the conduct at issue fell within the community standard of care, unless the plaintiff provides conflicting expert evidence.  The court considered Dr. Snibbe's October 14, 2019 operative report submitted by Guarino and concluded it was insufficient to create a triable issue of fact as to Dr. Tauber's alleged breach of the standard of care.  Although the report stated the "initial surgeon" (presumably Dr. Tauber) did not properly address Guarino's femoral stem subsidence, this did not constitute Dr. Snibbe's professional medical opinion on whether Dr. Tauber's surgery was performed within the standard of care.  Further, despite stating that Guarino's femoral stem was grossly loose, Dr. Snibbe's report did not address what caused the loosening.

On May 26, 2023 the trial court entered judgment in favor of Dr. Tauber.  Guarino timely appealed.

## DISCUSSION

A.    *Standard of Review on Summary Judgment*

Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 668.)  "'"We review the trial

11

court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.'" (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 39; accord, *Doe*, at p. 669; *Sabetian v. Exxon Mobil Corporation* (2020) 57 Cal.App.5th 1054, 1068.)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Sabetian v. Exxon Mobil Corporation, supra*, 57 Cal.App.5th at p. 1068.) If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Sabetian*, at p. 1069.)

We review a trial court's ruling on a motion for summary judgment by "decid[ing] independently whether the facts not subject to triable dispute warrant judgment for the moving party or a determination a cause of action has no merit as a matter of law." (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 582; accord, *Campbell v. FPI Management, Inc.* (2024) 98 Cal.App.5th 1151, 1161.) "'In performing an independent review of the granting of summary judgment, we conduct the same procedure employed by the trial court. We examine (1) the pleadings to determine the elements of the claim, (2) the motion to determine if it establishes facts justifying

12

judgment in the moving party's favor, and (3) the opposition—assuming movant has met its initial burden—to "decide whether the opposing party has demonstrated the existence of a triable, material fact issue."' [Citation.] 'We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale.' [Citation.] Thus, a reviewing court 'will affirm a summary judgment if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons.'" (*Martin v. Board of Trustees of California State University* (2023) 97 Cal.App.5th 149, 160-161; accord, *Murchison v. County of Tehama* (2021) 69 Cal.App.5th 867, 881-882.)

B.      *Dr. Tauber Met His Initial Burden on Summary Judgment*
        Guarino contends Dr. Mikulak's expert declaration was insufficient to shift the evidentiary burden on summary judgment. "The elements of a claim for professional negligence are "'(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.""" (*Paul v. Patton* (2015) 235 Cal.App.4th 1088, 1095; accord, *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122.) "Medical providers must exercise that degree of skill, knowledge, and care ordinarily possessed and exercised by members of their profession under similar circumstances." (*Powell*, at p. 122; accord, *Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 108, fn. 1.)

"'In professional malpractice cases, expert opinion testimony is required to prove or disprove that the defendant performed in accordance with the prevailing standard of care.'" (*Ryan v. Real Estate of Pacific, Inc.* (2019) 32 Cal.App.5th 637, 644-645; accord, *Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 288.)  Further, "'"[t]he standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman."'" (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001; accord, *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968.)  Competent expert testimony is similarly required to show the element of causation for a medical malpractice cause of action.  (*San Antonio Regional Hospital v. Superior Court* (2024) 102 Cal.App.5th 346, 350 [Proving the third element, causation, also requires "'"competent expert testimony"'"]; accord, *Salasguevara v. Wyeth Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 385.)

Experts may base their opinions on any matter reasonably relied upon by experts in forming opinions about the subject matter at issue, except where the law precludes consideration of the matter.  (Evid. Code, § 801, subd. (b).)  "'[T]he opinion of any expert "is only as good as the facts and reasons on which it is based,"'" and the trial court may properly exclude expert testimony that lacks foundation or is speculative or conclusory, even if it is unopposed.  (*Zaragoza v. Adam* (2025) 109 Cal.App.5th 113, 119; accord, *Lynn v. Tatitlek Support Services, Inc.* (2017) 8 Cal.App.5th 1096, 1115-1116.)

14

Guarino contends Dr. Tauber failed to meet his initial burden of proof to show there is no factual basis for relief, and the burden never shifted to him. (See *Doe v. Good Samaritan Hospital* (2018) 23 Cal.App.5th 653, 662 ["[E]ven if [plaintiff] did not present competing expert testimony, it remained [defendant]'s burden to . . . show there was no factual basis for relief on any theory presented by [plaintiff]."]; see also *McAlpine v. Norman* (2020) 51 Cal.App.5th 933, 938-939 [because defendant's expert declaration was insufficient to meet initial burden on summary judgment, trial court erred in granting summary judgment despite absence of competing expert testimony].) Although the trial court erred in not addressing Dr. Tauber's initial burden, we independently review the sufficiency of Dr. Mikulak's declaration to shift the burden. (See *Salasguevara v. Wyeth Laboratories, Inc., supra*, 222 Cal.App.3d at p. 384 [independently reviewing defendant's medical expert evidence where trial court erred in focusing solely on plaintiff's burden on summary judgment]; see also *Martin v. Board of Trustees of California State University*, *supra*, 97 Cal.App.5th at pp. 160-161.)

Dr. Mikulak's declaration was sufficient to shift the evidentiary burden to Guarino. By the time Dr. Tauber filed his summary judgment motion, Guarino in his discovery responses had limited his medical malpractice cause of action to one theory of liability—negligent performance of the surgery. (See *Burke v. Superior Court of Sacramento County* (1969) 71 Cal.2d 276, 281 ["'To the extent that interrogatories are used to clarify the contentions of the parties, they are an adjunct to the pleadings. . . . Liberal use of interrogatories for the purpose of clarifying and narrowing the issues made by the pleadings should

15

be permitted and encouraged by the courts.'"]; *Vera v. REL-BC, LLC* (2021) 66 Cal.App.5th 57, 65, fn. 2 [court could preclude a plaintiff from relying on a theory not stated in response to a relevant interrogatory]; *Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 445-446.) Guarino's discovery responses made clear that his theory of liability was based on Dr. Tauber's November 28, 2018 performance of the full hip replacement surgery, including his choice of implant type and size and attachment of the implant.

Dr. Mikulak was a board-certified orthopedic surgeon familiar with the standard of care applicable to the hip replacement surgery performed on Guarino. Dr. Mikulak reviewed Guarino's relevant medical records, including from Guarino's pre-2017 hip surgery and treatment, and the subsequent surgeries and treatment by Dr. Tauber and Dr. Snibbe, and he accurately recounted Guarino's extensive medical history. Dr. Mikulak opined Dr. Tauber complied with the applicable standard of care in performing Guarino's hip replacement surgery because radiographic images and medical reports within the nine months following the surgery depicted or described Guarino's femoral implant as stable, anatomically aligned, not loose, and not having subsided. Based on the consistency of these records, Dr. Mikulak further concluded Dr. Tauber selected the proper type and size of femoral implant and properly performed the surgery. This showing was sufficient to shift the evidentiary burden to Guarino with respect to Dr. Tauber's alleged breach of the applicable standard of care.[4]

---

[4] Because we conclude Dr. Tauber met his evidentiary burden with respect to breach of the standard of care, we do not reach whether he met this burden as to causation.

16

(See *Wicks v. Antelope Valley Healthcare Dist.* (2020) 49 Cal.App.5th 866, 879 [expert's accurate recounting of relevant facts and his opinion that doctor's conduct was appropriate in light of those facts was sufficient to shift evidentiary burden]; *Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 468 [defendants shifted evidentiary burden where their expert was familiar with the standard of care and opined the defendants acted appropriately within the standard of care].)

Guarino argues Dr. Mikulak's declaration failed to shift the evidentiary burden because he ignored Dr. Snibbe's October 14, 2019 operative report, which stated Guarino's leg was "improper[ly] align[ed]" and had experienced "significant shortening," and Guarino's femoral implant was "grossly loose" and "not attached" to the bone. Although Dr. Mikulak did not specifically address Dr. Snibbe's operative report in reaching his conclusion that Dr. Tauber performed Guarino's surgery within the standard of care, Dr. Mikulak reviewed the DOCS Surgical Hospital records, which included Dr. Snibbe's operative report. Further, Dr. Mikulak acknowledged that Dr. Snibbe noted at Guarino's July 25, 2019 visit that the X-ray reflected subsidence of the femoral component "leading to shortening of the right leg in comparison to the left." Dr. Mikulak reached his opinion after reviewing these documents and Guarino's extensive medical records, including radiographic images and studies for the nine months following Dr. Tauber's surgery. These reports included the August 22, 2019 report from the CT scan stating the hardware was intact and had normal alignment as of that date.

Absent an expert opinion stating Dr. Mikulak's review was inadequate, we have no basis to conclude it was unreasonable for Dr. Mikulak to rely on the records reflecting Guarino's condition during the nine months immediately following the surgery without crediting the statements in Dr. Snibbe's subsequent operative report.[5] (See Evid. Code, § 801, subd. (b) [the basis of expert testimony is matter "that reasonably may be relied upon . . . in forming an opinion"]; see also *Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 306-307 [rejecting as insufficient an expert declaration based on an evaluation well after the surgical procedure at issue].)

Guarino also contends there is no factual basis for the statement in Dr. Mikulak's declaration that Guarino had only a 10-millimeter discrepancy in the length of his legs following Dr. Tauber's surgery. Guarino is correct that Dr. Mikulak does not specify the basis for this statement, nor does Dr. Tauber in his respondent's brief clarify what the basis is. Even without this factual assertion, however, Dr. Mikulak's declaration provided a sufficient foundation for his conclusion based on his education, training, and experience that Dr. Tauber performed Guarino's hip replacement within the standard of care. Dr. Mikulak cited specific radiographic images taken after the surgery that showed Guarino's right hip was anatomically aligned and post-operative medical reports stating Guarino's femoral implant was stable without loosening or subsiding of the implant.

For example, according to Guarino's records, X-rays conducted on June 12, 2019 showed Guarino's "[r]ight total hip prosthesis [was] satisfactorily position[ed] without loosening."

---

[5]    We discuss further Dr. Snibbe's operative report below.

18

Dr. Michael Im similarly concluded, based on his review of the August 22, 2019 X-rays, that Guarino's right hip replacement demonstrated "normal alignment, intact hardware, [and was] unchanged compared to right hip radiographs on 6/12/2019." Dr. Mikulak properly relied on his training and experience, as well as these radiographic studies. (See *Fernandez v. Alexander* (2019) 31 Cal.App.5th 770, 780-781 [orthopedic surgeon could rely on extensive experience in the field to assert factual proposition]; *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 509 ["To state that one has experience in certain medical procedures and has reviewed pertinent medical records and that based on that experience and that review, the declarant has found nothing to support a claim of medical malpractice and therefore concludes that there was none is not an improper conclusion for an expert witness."].)

Guarino cites no authority for the proposition that a medical expert's opinion is not sufficient to meet a party's initial burden on summary judgment where one fact relied on by the expert lacks a factual basis but the expert relied on multiple other facts in the record to support the opinion. Although an opposing expert could have challenged Dr. Mikulak's opinion based on lack of foundation for the 10-millimeter statement (potentially creating a question of fact), Dr. Mikulak's declaration, even absent the specific measurement, was sufficient to meet Dr. Tauber's initial evidentiary burden on summary judgment. (See Code Civ. Proc., § 437c, subd. (e) [with limited exceptions, "summary judgment shall not be denied on grounds of credibility . . . of witnesses furnishing affidavits or declarations in support of summary judgment"].) Accordingly, Dr. Tauber

19

shifted the burden to Guarino to present a triable issue of fact as to his medical malpractice cause of action.

C.    *The Trial Court Did Not Err in Finding Dr. Snibbe's Operative Report Failed To Raise a Triable Issue of Fact*

Guarino contends Dr. Snibbe's October 14, 2019 operative report created a triable issue of material fact.  The trial court correctly concluded it did not.  """California courts have incorporated the expert evidence requirement into their standard for summary judgment in medical malpractice cases.  When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence."""  (*Powell v. Kleinman, supra*, 151 Cal.App.4th at p. 123; accord, *Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607.) Guarino cites no authority (and this court has found none), stating a plaintiff may rely on medical records without expert testimony to prove professional negligence in a medical malpractice case.

Dr. Snibbe's operative report did not create a triable issue of fact with respect to Dr. Mikulak's opinion that Dr. Tauber's performance of Guarino's hip replacement was within the standard of care.  As discussed, Dr. Snibbe stated in his report that the "implant with the femoral stem subsided, which caused significant shortening of his leg and was complicated."  As an initial matter, Dr. Snibbe does not state what he meant by "significant shortening."  In reaching his opinion, Dr. Mikulak was aware that as of February 26, 2019, when Guarino visited Dr. Tauber, "there appeared to be shortness of the right lower

20

extremity," and as of July 25, 2019, Dr. Snibbe noted "subsidence of [the] femoral component" and "shortening of the right leg." The fact there was subsidence of the femoral stem and, according to Dr. Snibbe, "significant shortening" of Guarino's leg following the surgery does not, without more, show that Dr. Tauber did not perform the hip replacement surgery within the standard of care. Likewise, Guarino points to the comment in Dr. Snibbe's report that the femoral stem "was grossly loose," which he states was shown by the August 7, 2019 bone scan. Dr. Snibbe added that "about 75-80% of the stem was grossly loose." However, as discussed, the radiologist who reviewed the bone scan stated only that the scan was "compatible with loosening" of the distal tip of the femoral stem, not that it was "grossly loose" or 75 to 80 percent loose. Dr. Snibbe's characterization of the bone scan results does not, without some foundation for his interpretation of the radiologist's report, create a triable issue of fact.

Nowhere in his operative report did Dr. Snibbe state Dr. Tauber failed to perform the surgery within the standard of care. Rather, Dr. Snibbe surmised that the subsidence of Guarino's femoral stem and shortening of Guarino's leg following the surgery "was not addressed by the initial surgeon properly and was allowed to heal in a poor position." However, Guarino's medical malpractice case was based on Dr. Tauber's alleged negligent performance of the surgery. As discussed, Guarino stated in his response to Dr. Tauber's interrogatories that Dr. Tauber committed professional negligence on or around November 28, 2018 (the date of the surgery), and that Dr. Tauber "improperly performed full hip replacement surgery" on Guarino in that the prosthetic hip implant "was improperly aligned, the wrong type and size, [and] grossly loose." Further, Dr. Snibbe's

21

statement in his report that the need for revision surgery was "directly related to [Guarino's] accident" undermines any inference that Dr. Snibbe was attributing the observations in his report to Dr. Tauber's surgical performance.

Moreover, to the extent Dr. Snibbe was expressing an expert opinion on Dr. Tauber's post-surgical care, Dr. Snibbe did not provide a foundation for his statement that Dr. Tauber failed to provide proper care, for example, by explaining what Dr. Tauber did (or did not do) during the period from November 28, 2018 (the date of the surgery) to February 26, 2019 (Guarino's last visit with Dr. Tauber). Rather, Dr. Snibbe's report was based only on his observations of Guarino 10 months after Dr. Tauber's surgery. Dr. Snibbe's operative report does not state whether Dr. Snibbe reviewed Guarino's medical records to determine if Dr. Tauber's treatment of Guarino following the surgery was not "proper" or otherwise did not fall within the standard of care. (See *Doe v. Good Samaritan Hospital, supra*, 23 Cal.App.5th at p. 656 ["It is well settled that, where an expert declaration does not provide the facts upon which its conclusions are based and a reasoned explanation of how such facts led to the conclusions, it 'does not establish the absence of a material fact issue for trial, as required for summary judgment.'"]; accord, *McAlpine v. Norman, supra*, 51 Cal.App.5th at p. 939 [same].)

Accordingly, Dr. Snibbe's report did not create a triable issue of fact sufficient to defeat summary judgment. (See, e.g., *Fernandez v. Alexander, supra*, 31 Cal.App.5th at pp. 781-782 [summary judgment was proper where medical expert's opinion neither challenged defense expert's opinion nor provided reasoned explanations for its conclusions]; *Alexander v. Scripps Memorial Hospital La Jolla, supra*, 23 Cal.App.5th at p. 229

22

["Without at least some minimal basis, explanation, or reasoning, [medical expert's] conclusions . . . in his . . . declaration had no evidentiary value."].)

D.    *Guarino's Declaration Did Not Create a Triable Issue of Fact*

Guarino contends the trial court erred in sustaining Dr. Tauber's evidentiary objection to Guarino's declaration, and the declaration created a triable issue of fact. Even if the trial court erred in excluding the entirety of Guarino's declaration, the declaration did not create a triable issue of fact.

As discussed, professional negligence in a medical malpractice action can only be proven with expert testimony. A layperson may provide testimony in a medical malpractice action only under the "common knowledge" exception to this rule, "i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'" (*Lattimore v. Dickey, supra*, 239 Cal.App.4th at p. 968, fn. 3; accord, *Flowers v. Torrance Memorial Hospital Medical Center, supra*, 8 Cal.4th 992 at p. 1001.) "This exception is . . . a limited one. It arises[, for example,] when a foreign object such as a sponge or surgical instrument, is left in a patient following surgery," an injury occurs to a body part not slated for medical treatment, or an incorrect limb is amputated. (*Scott v. Rayhrer* (2010) 185 Cal.App.4th 1535, 1542; accord, *Ewing v. Northridge Hospital Medical Center* (2004) 120 Cal.App.4th 1289, 1302-1303; *Curtis v. Santa Clara Valley Medical Center* (2003) 110 Cal.App.4th 796, 801.)

23

Guarino declared his right leg began shortening after his surgical procedure and it "had shortened by over 2 inches or 50 [millimeters]" by October 2, 2019. Even if the trial court erred in excluding the entirety of Guarino's declaration,[6] this statement regarding the shortening of Guarino's leg by the time of Dr. Snibbe's surgery—10 months after the surgery—does not create a triable issue of fact without an expert opinion stating that this amount of shortening shows Dr. Tauber performed the surgery below the standard of care, or that the surgery caused the shortening. Guarino does not state when he took the initial measurement or what interim measurements, if any, he took during the 10-month period between the two surgeries in which his leg "began shortening in length slowly over time." As discussed, there was no basis for Dr. Mikulak's statement Guarino's leg had shortened by 10 millimeters. But the fact that Guarino's 50-millimeter measurement was greater than the 10-millimeter discrepancy Dr. Mikulak noted does not, absent an opinion as to the significance of Guarino's measurement, create a triable issue of fact.

---

[6] We agree with Dr. Tauber that hearsay statements in Guarino's declaration, including his description of Dr. Snibbe's opinion in paragraph 8, are inadmissible. By contrast, Guarino's statement from personal knowledge that he used a cane a few months after the surgery (paragraph 6) was admissible.

## DISPOSITION

We affirm the judgment.  Dr. Tauber is entitled to recover his costs on appeal.


FEUER, J.

We concur:


MARTINEZ, P. J.


SEGAL, J.